# In the United States Court of Federal Claims

No. 19-974C
(Filed Under Seal: August 20, 2019)
(Reissued for Publication: September 3, 2019)[*]

```
*******************************************
CHROMALLOY SAN DIEGO          *
CORPORATION,                  *
                              *
              Plaintiff,      *
                              *
v.                            *
                              *   Bid Protest; Challenge to Solicitation
THE UNITED STATES,            *   Requirements; Motion to Supplement the
                              *   Administrative Record; Technical Data
              Defendant,      *   Rights
                              *
and                           *
                              *
GENERAL ELECTRIC COMPANY,     *
                              *
              Defendant-Intervenor.  *
*******************************************
```

Paul F. Khoury, Washington, DC, for plaintiff.

William J. Grimaldi, United States Department of Justice, Washington, DC, for defendant.

Jason A. Carey, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this bid protest, plaintiff Chromalloy San Diego Corporation ("Chromalloy") contests the terms of a solicitation issued by the Naval Surface Warfare Center ("Navy") to acquire marine engine overhaul services. The engines at issue, LM2500 Paired Blade Turbine ("PBT") Gas Generators, are manufactured by defendant-intervenor General Electric Company ("GE"). Chromalloy challenges two solicitation requirements: that offerors possess independent access to GE technical manuals and service bulletins, and that offerors have access to certain GE-

---

[*] The court provided the parties with an opportunity to suggest redactions to this ruling, but in an August 30, 2019 joint status report, they indicated that no redactions were necessary.

manufactured tools.  Currently before the court is Chromalloy's motion to supplement the administrative record.  For the reasons set forth below, the court denies that motion.

# I.  BACKGROUND

## A.  LM2500 PBT Gas Generators

"The LM2500 PBT gas generator was designed and manufactured by GE and is utilized by the U.S. Navy as the main propulsion gas turbine engine aboard over 100 surface combatants including FFG 7, CG 47, and DOG 51 ship classes."[1]  AR 1294.  To meet the demand for the engines and ensure mission readiness, the Navy maintains a pool of spare engines that have been overhauled.  Id.  Prior to May 2017, the Navy overhauled the engines at the Fleet Readiness Center Southwest in North Island, California.  Id. at 1257.  However, that facility ultimately was unable to satisfy the Navy's annual requirement of twelve spare engines.  Id. at 1294.  Thus, in May 2017, the Navy awarded two two-year indefinite-delivery, indefinite-quantity, firm-fixed-price contracts for the necessary overhaul services.  Id. at 1257.

## B.  Original Solicitation

Subsequently, on August 28, 2018, the Navy issued solicitation N64498-18-R-4023, id. 143, to procure "commercial depot-level overhaul" services for LM2500 PBT Gas Generators used by the Navy, the United States Coast Guard, the National Sealift Command, and foreign military navies, id. at 145.  The Navy sought to award one or more indefinite-delivery, indefinite-quantity, firm-fixed-price contracts, with the ordering period under those contracts to span sixty months.  Id. at 146.  Overhaul services would be ordered through task orders, up to a cumulative ceiling of $70 million.  Id.

One of the key requirements in the solicitation was that offerors be GE Level IV licensed commercial depots.  Id. at 146, 148, 242.  This requirement originated in the Individual Streamlined Acquisition Plan prepared by the Navy prior to the issuance of the solicitation:

> Only GE Level IV licensed facilities may perform this level of overhauls.  The GE Level IV licensing agreement between GE and the particular depot sets the guidelines for the depot facility to work on GE designated engine models, including the LM2500.  It establishes terms and conditions to use GE's intellectual property and provisions (e.g., quality requirements) to accomplish repair and test of GE designated engine models.  This certification standard determines the types of repairs that the depot can perform under GE's guidance and authorization/control.  This is the mechanism for the facilities to buy only GE-approved gas turbine components for engine repairs and overhauls to ensure that no unauthorized or aftermarket type parts are being used.

Id. at 1295.  The Navy also explained the need for such a requirement to offerors in Amendment 1 to the solicitation, issued on October 4, 2018:

---

[1]  The court derives the facts in Part I from the administrative record ("AR").

GE Level IV licensed commercial depots have direct access to [original equipment manufacturer ("OEM")] (GE) certified parts that are listed in the Navy LM2500 manual Illustrated Parts Breakdown (IPB).  These GE certified parts are necessary for our Navy application.  Use of a non-GE Level IV overhaul depot is not authorized by [the Navy] because uncertified overhaul depots may obtain parts from aftermarket sources with no point of origin to evaluate the pedigree of the components.  GE Level IV licensed commercial depots have access to GE (OEM) technical support, as needed.  GE will not support questions for engines under repair at uncertified depots.  Level IV licensed OEM depots also have access to certified vendor support for individual component repairs which have been independently validated to meet OEM specifications.

This is not a new requirement, as it was included in the previous procurement solicited under N64498-18-R-5015 by this contracting office.

Id. at 244.

The Navy's presolicitation market research had revealed that there were nine GE Level IV licensed commercial depots, id. at 1297, three of whom were potential offerors, id. at 1189.  Chromalloy was not identified as possessing a GE Level IV licensed commercial depot, id. at 1297, or as a potential offeror, id. at 1189.  However, the Navy had previously found Chromalloy qualified to overhaul LM2500 engines despite Chromalloy's lack of a GE Level IV license.  See, e.g., id. at 1732 (indicating that although Chromalloy was not awarded contracts N00104-14-D-F001, N00104-14-D-F002, and N00104-14-D-F003 related to the LM2500 Power Turbine Assembly, the LM2500 PBT Gas Generator, and the LM2500 Single Shank Turbine Gas Generator, respectively, the Navy found Chromalloy "to meet the criteria stated in the solicitations," such as being "'an established overhaul depot technically capable in commercial overhaul'"; and further indicating that Chromalloy has served prior Navy contracts, held many small LM2500-related contracts, and "overhauled engines commercially for the County of Los Angeles, Signal Hill, Gasaway Engineer LLC, PDVSA, AAR Aircraft Turbine Center, and the Indonesian Navy"), 1740 (indicating that Chromalloy was a subcontractor on "contracts N65540-15-R-5016 and N64498-16-R-5023 to disassemble LM2500 engines"), 1838 (explaining that (1) "[h]istorically, [Chromalloy has] performed numerous commercial and industrial PBT overhauls," (2) "[t]o date, [Chromalloy has] not been awarded a 'full overhaul' contract with the US Navy," and (3) Chromalloy had addressed, and been found "technically acceptable" under, the following criteria: (a) "prior experience in overhauling LM2500 gas generators or similar item for industrial or marine applications"; (b) "facilities and capabilities to clean, inspect, and repair gas generator components in accordance with US Navy LM2500 depot level technical manual"; and (c) "ability to overhaul gas generator accessories in accordance with US Navy LM2500 depot level technical manual"); cf. id. at 1466 (reflecting that GE and Chromalloy Gas Turbines LLC were parties to a Component Repair License Agreement "relating to the component repair of selected components for industrial and/or commercial marine . . . LM2500 . . . gas generators and/or gas turbines").

In light of the discrepancy between its prior experience with the Navy and the solicitation requirement, on October 10, 2018, Chromalloy lodged a protest at the Government Accountability Office ("GAO") to challenge the licensure requirement as anticompetitive.  Id. at 1303-513.  In response, the Navy took corrective action by issuing Amendment 3 to the solicitation, effective November 6, 2018, id. at 247, which eliminated the requirement that offerors be GE Level IV licensed commercial depots, compare id. at 148 (original solicitation), with id. at 250 (Amendment 3).

### C. The Navy's Initial Correspondence With GE

During the pendency of Chromalloy's GAO protest, the Navy and GE engaged in discussions regarding the GE Level IV licensure requirement.  Id. at 482-87.  On October 31, 2018, Cate Widmann, a GE senior contract manager, responding to questions posed by Brian D. McGuire, the Navy's contract specialist, advised:

(1)  The Service Provider Letter and LM2500 [Authorized Service Provider] Obligations document . . . spell out the obligations placed on the licensee by GE which are required to comply with GE's stringent commercial quality control processes and allow GE warranties on its OEM parts to remain valid.

(2)  [T]here is no formal license agreement between GE and the US Navy outside of [Federal Acquisition Regulation/Defense Federal Acquisition Regulation Supplement ("DFARS")]/Agency specific clauses; however, GE works closely with the Navy depots to ensure that they are certified, through other means.  Notably, GE sells OEM spare parts directly to various [United States Department of Defense] agencies, including [the Defense Logistics Agency,] for use by the Navy depots.  GE provides, pursuant to . . . DFAR[S] 252.227-7015, limited commercial data rights with regard to LM2500[] (a commercial product developed solely at GE expense) to the Navy which govern use of all GE Intellectual property including GE IP contained in GE manuals and US Navy manuals including updates as published – benefits only provided to authorized service providers.  Other clauses, contained in specific, negotiated contracts with the Navy, work to ensure GE OEM engineering and technical support are provided to the Navy under terms which are equivalent to or exceed[] that contained commercial depot license agreements.

Id. at 484.  Ms. Widmann also suggested that a telephone call "would be beneficial" in that it "might help expedite the information gathering process for both parties."  Id.

Mr. McGuire responded the following day to suggest "a quick call for some informal information gathering[.]"  Id. at 483.  The telephone call apparently occurred since Ms. Widmann forwarded an Authorized Service Provider document to Mr. McGuire "per [their] discussion."  Id.  One week later, on November 8, 2018, Ms. Widmann requested an update from Mr. McGuire, to which Mr. McGuire responded:  "Issue is resolved."  Id. at 482.

### D.  Solicitation Through Amendment 5

After the Navy issued Amendment 3 to resolve the GAO protest, it twice more amended the solicitation before the December 11, 2018 due date for proposals.  Id. at 271-82.

### 1.  Statement of Work

As amended, the solicitation included a statement of work in which the Navy set forth detailed requirements for the work to be performed under the contract.  Id. at 249-62.  In general:

> The Contractor shall overhaul, modify, incorporate mandatory updates, maintain standard configuration integrity, assemble, test, preserve, package, document, mark and prepare for shipment the LM2500 PBT gas generator in accordance with this specification.

> All overhaul work performed under this specification shall be in accordance with the current US Navy LM2500 depot level technical manuals . . . . Any and all deviations from these technical manuals must be approved, in writing, by the cognizant technical representative . . . .

Id. at 250.  In addition to dictating the procedures for overhauling the engines, the Navy described the material that awardees could use for the overhaul work:

> The Contractor shall supply and only use US Navy approved parts in the overhaul of US Navy LM2500 PBT gas generator.  All approved parts for use in US Navy LM2500 PBT gas generator are listed in the US Navy LM2500 Illustrated Parts Breakdown [in the technical manuals].  The use of aftermarket parts is not permitted.

Id. at 251.  The Navy represented that it would provide awardees with its LM2500 technical manuals as government furnished information.  Id. at 250.

### 2.  Proposal Contents

The Navy directed offerors to submit their proposals in two volumes—one with the offeror's proposal documents and one with the offeror's technical proposal.  Id. at 266.  With respect to the technical proposal, the Navy set forth the following requirements in section L.3.2 of the solicitation:

> An Offeror must provide either a copy of a current GE Level IV License or, in the alternative, provide detailed information which clearly and completely addresses the following:

> a.  Spare Parts Access:  The Offeror shall demonstrate it has the ability to provide genuine OEM-certified LM2500 parts and assemblies as required during the overhaul and repair processes.

      b.  Special Tooling:  The Offeror shall demonstrate it owns or has access to all necessary special tools required to completely disassemble, overhaul, and reassemble LM2500 gas generators.  The Special tooling that must be addressed [includes twenty-three identified items.]

      c.  Testing:  The Offeror shall demonstrate it possesses an active Large Turbine Test Cell in accordance with Paragraph C.3.2 of the Statement of Work which will permit performance testing of Navy LM2500 gas generators at the conclusion of the Overhaul & Repair Process.

      d.  Quality:  The Offeror provides a current ISO 9001 quality assurance program certification.

Id. at 280-81.

### 3.  Proposal Evaluation

The Navy indicated in the solicitation that it intended to award contracts to those offerors who were "determined to be a responsible source," who "submit[ted] a technically acceptable proposal that conform[ed] to the requirements of this solicitation," and who "the Government ha[d] no reason to believe would be likely to offer other than fair and reasonable pricing."  Id. at 281.  As relevant in this protest, technical acceptability, which would "be determined based on information submitted in the Technical Proposal," required an offeror to "provide the requisite information required in Section L.3.2 and be rated acceptable" for the technical factor.  Id.  In other words, an offeror was required to:

      (1)  Possess a current GE Level IV License or;

      (2)  Provide all of the information required in Section L.3.2 and clearly demonstrate that it has the capability provide OEM-certified parts, have access to the special tooling identified in L.3.2.b, possess a test cell in accordance with Section C.3.2, and provide a current ISO 9001 quality assurance program certification.

Id.  The Navy reserved the right to hold discussions and request final proposal revisions.  Id. at 282.

### E.  Chromalloy's Proposal

Chromalloy was one of three offerors, id. at 1698, that timely submitted a proposal, id. at 1520-697.  The two other offerors—the incumbent contract holders, id. at 1725—were "licensed by the OEM to perform depot-level overhauls," but Chromalloy was not, id. at 1724.  Thus, in its technical proposal, Chromalloy "provided information to address the alternative criteria" set forth in section L.3.2 of the solicitation.  Id. at 1727.

**F.  The Navy's Second Round of Correspondence With GE**

On December 14, 2018, three days after the proposal due date, W. Hartmann Young, a senior counsel for GE, sent a letter to counsel for the Navy, Howard B. Rein, requesting "immediate action" regarding the solicitation.  Id. at 543.  Specifically, he wrote:

> It has come to our attention that the Navy has amended the Solicitation to potentially allow for award to offerors without [a] GE Level IV license. Entertaining such a possibility is ill-considered and beyond Navy authorization for a number of reasons.  First, offerors lacking a GE Level IV license cannot demonstrate that they have the right to provide GE-certified parts to the Navy, and any suggestion to the contrary is false.  Second, the use of other than GE-certified parts will void any warranty protections currently applicable to the fielded and future LM2500 engines.  Third, if the Navy provides its technical manuals lacking the appropriate GE license, the Navy will be breaching its contractual commitments already made to GE and will be violating GE's intellectual property rights.  Fourth, entertaining an award to unlicensed offerors will irreparably undermine what has been a mutually advantageous relationship between the Navy and GE on the LM2500.
>
> . . . .
>
> GE respectfully requests that you immediately cease the consideration of offerors lacking a GE Level IV license, and that you do not award a contract to any offeror lacking such a license.  GE also asks for an immediate meeting on the issues raised in this letter.

Id. at 543-45; accord id. at 544 ("You are on notice that every contract by which GE has provided the LM2500 to the Navy has been with limited rights since GE first sold the LM2500 to the U.S. Government.  GE over this time has provided large amounts of technical data and other intellectual property to the Navy in support of the LM2500, but always appropriately marked as limited rights data.  This means that you cannot provide GE technical data to GE's competitors or, as is the case here, to companies lacking the appropriate license, without breaching your contractual commitments to GE.  See, e.g., DFARS 252.227-7015.").

The Navy initially agreed to meet with GE during the week of January 14, 2019, but subsequently cancelled the meeting on January 8, 2019, explaining:

> "Although we are not opposed to meeting with you and do welcome the chance to speak with you, presently, to protect the integrity of the ongoing procurement, and while we are in the process of evaluating offers, it does not seem appropriate for us to communicate concerning the matter until the conclusion of this competition."

Id. at 531 (quoting the Navy's correspondence).  Mr. Young therefore sent another letter to Mr. Rein on January 10, 2019,[2] id. at 530-32, writing:

> I am writing on behalf of GE Marine (GE) to urgently request that the [Navy] suspend activities that could lead to one or more contract awards to unlicensed vendors bidding under the referenced solicitation, and to renew our request for a meeting to discuss this request.  By proceeding on its current course, the [Navy] is jeopardizing GE proprietary information related to the LM2500 engine, which [the Navy] and its personnel, respectively, are contractually and legally barred from sharing with third parties.  In short, if [the Navy] awards a contract to an unlicensed vendor, it will place the Navy in breach of several of its existing contracts with GE.

Id. at 530.  He referred to his December 14, 2018 letter, and expanded:

> [I]f the [Navy] selects an unlicensed vendor, it would be compelled to violate contractual commitments to GE and statutory obligations that apply to Executive Branch employees, including the Trade Secrets Act, 18 U.S.C. § 1905.  This is because those manuals contain GE proprietary information related to GE's LM2500 engines, the servicing of which is the subject of the referenced solicitation.  GE has only ever provided the Navy technical information related to the LM2500 with narrowly circumscribed technical data rights pursuant to

---

[2] While Mr. Young was corresponding with the Navy personnel involved in the procurement at issue, David Nelson, the director of Sales and Business Development for GE Aviation, sent a letter on January 11, 2019, to two Navy program managers requesting their "urgent assistance."  Id. at 546.  He wrote that the Navy was

> on the brink of willfully violating GE LM2500 Intellectual Property rights and breaching contractual provisions, with potentially serious impact to ongoing GE support of the USN LM2500 fleet.  Repeated appeals to the [Navy's legal] team to stop this activity pending discussion on the matter have been rebuffed.  I request that you immediately intercede on our behalf.

Id.  He further warned:

> GE will need to radically alter the way it conducts business with the Navy should [it] elect to violate commitments to protect GE's intellectual property.  Should the Navy, departing from longstanding practice, decide to no longer protect GE Proprietary Information, it will impact all LM2500 technical exchange with the Navy, including technical data, operational data, maintenance manuals, depot support, service bulletins, part/component updates, and engineering design data.  Collaboration on product improvements and technology upgrades would also be at risk.

Id. at 546-47.  The administrative record does not include any response to this letter.

contracts, or otherwise with a proprietary information legend.  These contracts, as has been the case since the LM2500 Gas Turbine was first offered for sale to the Navy in 1969, are subject to DFARS 252.227-7015 "Technical Data Commercial Items".  No LM2500 Gas Turbine has been sold to the [Navy] directly or through a prime shipyard contract with other than the limited commercial data rights described in that DFARS clause. . . .  In short, the [Navy] is not authorized to share GE's proprietary and technical information – whether in the form of a GE Marine manual or as part of a separate Navy manual – with a third party without GE's consent.

Id. at 531.  He therefore renewed GE's request for an immediate meeting with the Navy "to address this situation."  Id.

The Navy acknowledged receipt of Mr. Young's letter, but indicated that it intended to complete the competition.  Id. at 528-29.  However, it noted that it did "not intend to release any alleged proprietary information to vendors lacking a GE license prior to meeting with [Mr. Young] to discuss any and all relevant concerns."  Id. at 529.  Approximately two weeks later, the Navy further advised Mr. Young that he would be contacted immediately after the competition had concluded.  Id. at 528.

### G.  The Navy's Consideration of GE's Contentions

Although it declined to meet with GE during the competition, the Navy took under advisement GE's contentions that providing technical manuals to companies without a GE Level IV License would violate the Trade Secrets Act and GE's intellectual property rights.  Id. at 137.  Ultimately, it concluded:  "[T]he manuals, although titled 'Navy Technical Manuals,' contain inextricable GE proprietary information that has been incorporated over many years.  This information cannot be released to non-GE Level IV Licensed offerors without GE authorization.  GE's numerous complaints were adamant that it does not authorize such release."  Id.

### H.  The Navy's Evaluation of Chromalloy's Proposal, Discussions, and Amendment 6

As represented to Mr. Young, the Navy's evaluation of proposals remained ongoing.  Upon evaluating Chromalloy's proposal, the Navy found the information provided by Chromalloy to be deficient.  Id. at 1725.  Because of that finding, and in light of a "significant shortfall of . . . LM2500 PBT engines to support the [Navy's] modernization schedule," the Navy determined that discussions with Chromalloy were necessary.  Id.  Accordingly, on February 19, 2019, the Navy sent a discussion letter to Chromalloy indicating that it had rated Chromalloy's technical proposal as unacceptable and identifying three deficiencies related to Chromalloy's access to spare parts and special tooling.  Id. at 291-93.

In addition to identifying the three proposal deficiencies, the Navy advised Chromalloy that concurrent with its discussion letter, it was issuing Amendment 6 to the solicitation, which included new requirements:

Please note that Amendment 0006 states that Navy manuals will only be provided to awardees able to demonstrate compliance with Section L.3.2.a [-] L.3.2.f of the Solicitation.  These new, additional requirements are under Factor 1, Technical.  You must address all elements of Factor 1 . . . , including the new requirements and the deficiencies identified . . . , in order to be rated Acceptable for Factor 1 and eligible for award.

Id.; see also id. at 283-90 (Amendment 6).  As relevant to the instant motion, the Navy revised section L.3.2 of the solicitation as follows:

> Offerors must provide either a copy of a current GE Level IV License or, in the alternative, provide detailed information addressing the following requirements:
>
> . . . .
>
> e.  Technical Documentation:  Navy manuals will only be provided to awardees able to demonstrate compliance with Section L.3.2.a - L.3.2[.]f of this Solicitation.  Offerors must have access to all relevant LM2500 OEM service manuals, updates to those manuals, and service bulletins concerning the LM2500 engine, periodically issued by the OEM.  In order to satisfy this requirement, Offerors must provide evidence of access to the described OEM service-related information.
>
> f.  OEM Service Bulletins:  Offerors shall demonstrate [they have] access to service bulletins concerning the LM2500 engine, periodically issued by the OEM. Navy Service Bulletins will not be provided upon award.

Id. at 288-89.  The Navy also revised the evaluation criteria set forth in the solicitation, indicating that to be rated technically acceptable, an offeror was required to:

> (1)  Possess a current GE Level IV License or;
>
> (2)  Provide all of the information required in Section L.3.2 and clearly demonstrate that it has . . . access to current OEM technical documentation and service bulletins.

Id. at 289.

The Navy invited Chromalloy to submit a final proposal revision addressing the solicitation's new requirements and the identified proposal deficiencies by February 26, 2019.[3] Id. at 291-92.

---

[3]  The Navy also requested final proposal revisions from the other two offerors.  AR 137.  All three offerors submitted final proposal revisions.  Id.

## I.  The Navy's Third Round of Correspondence With GE

One day before the Navy initiated discussions with Chromalloy, Ms. Widmann sent the following inquiry to Mr. McGuire:  "I am writing to inquire regarding the status of the subject solicitation[].  GE continues to feel strongly that a face-to-face meeting with the Navy is required to discuss the urgent Intellectual Property/Trade Secrets issues raised in our prior correspondence with your office and Navy operational personnel."  Id. at 476; accord id. at 475 (noting that GE's "primary concern" was "the protection of [its] Intellectual Property and [its] need to have a face to face discussion with the Navy on this subject").  Mr. McGuire responded on February 19, 2019, that the procurement was "in the evaluation phase" and therefore he could not comment, but that upon the completion of the procurement, he would be able to schedule a meeting.  Id. at 475.  Then, on March 11, 2019, he forwarded a copy of Amendment 6 to Ms. Widmann.  Id. at 474.

## J.  GAO Protest

In the meantime, on February 25, 2019—after receiving the discussion letter but one day before its final proposal revision was due—Chromalloy lodged a protest with the GAO to challenge the requirements added to the solicitation with Amendment 6, namely, the requirements related to technical documentation/service bulletins and special tooling.  Id. at 1-8.  The parties provided extensive documentary evidence to the GAO in support of their positions.  See generally id. at 143-338, 345-440, 447-67, 470-72, 474-789, 1039-68, 1077-180.  The GAO held a hearing on Chromalloy's protest on April 24, 2019, id. at 790-1031, and issued a decision on June 3, 2019, id. at 1181-87.

In its decision, the GAO first addressed Chromalloy's challenge of the technical documentation/service bulletins requirements, summarizing Chromalloy's arguments as follows:

> Chromalloy primarily asserts that the Navy has acquired "unlimited rights" to GE's technical data and, based on that assertion, Chromalloy maintains that the solicitation should state that the Navy will provide GE's technical data, along with GE's future updates, to offerors that do not hold level IV licenses.  In this context, Chromalloy asserts that, pursuant to a recent contract, the Navy provided GE's technical data to Chromalloy, and Chromalloy maintains that the Navy should continue to do so.

Id. at 1184 (citation omitted).  The GAO then set forth the Navy's position:

> [T]he agency notes that:  the LM2500 was developed and manufactured at GE expense; GE provides its technical data to the Navy voluntarily to support the Navy's government-owned depot; the Navy has never acquired unlimited data rights to GE's manufacturing or process data; GE has consistently marked its manual containing the data necessary for overhauling the LM2500 as proprietary and subject to the Trades Secrets Act—violation of which would constitute a criminal act; and GE has not authorized release of such data to non-level IV

licensees.  Finally, the Navy states that it inadvertently provided GE's technical
data to Chromalloy under a recent contract, but has since notified Chromalloy of
the error and advised Chromalloy to destroy the data.  The Navy further notes that
its prior mistake regarding release of GE data does not provide a basis for failing
to comply with the Trade Secrets Act in the future.

Id. at 1184-85 (footnote and citations omitted).  The GAO concluded:

> Based on our review of the record, including the testimony provided
> during the GAO hearing, . . . we reject Chromalloy's assertion that the Navy must
> provide [the LM2500 manuals and updates] to Chromalloy.  As discussed above,
> the record is consistent with the Navy's assertions that the information was
> developed by GE at its own expense, and that GE has consistently identified the
> information as proprietary.  Finally, other than referring to the Navy's apparent
> prior release of GE technical data, Chromalloy has presented no support for its
> assertion that the Navy has acquired unlimited rights to that data.  On this record,
> the agency has reasonably supported its assertion that release of the information to
> Chromalloy would raise serious concerns regarding violation of the Trade Secrets
> Act, and the agency's prior release of such information does not render the current
> solicitation provision improper.

Id. at 1185; see also id. at 1182 (relying solely on the hearing testimony of a product
development manager for GE Marine Division for its finding that "[t]he record establishes that
. . . the development and manufacture of [the LM2500] generators was funded entirely by GE").

Because the GAO also rejected Chromalloy's challenge of the special tooling
requirement, it denied Chromalloy's protest.  Id. at 1181, 1186-87.

## K.  This Protest

Chromalloy filed the instant protest on July 5, 2019, asserting three claims for relief in its
complaint.  In Count I, Chromalloy contends that the requirement that offerors have independent
access to GE's technical manuals and service bulletins unduly restricts competition in violation
of the Competition in Contracting Act of 1984 ("CICA").  In Count II, Chromalloy contends that
the requirement that offerors use only GE-manufactured special tooling also unduly restricts
competition in violation of the CICA.  In Count III, Chromalloy contends that the special tooling
requirement is contrary to standard commercial practice and therefore violates the Federal
Acquisition Streamlining Act of 1994.  Chromalloy requests that the court declare the technical
data and special tooling requirements to be unlawful, and either (1) direct the Navy to award it a
contract or (2) enjoin the Navy from proceeding with the contract awards under the solicitation
and direct the Navy to revise the solicitation to be consistent with the law.

Shortly after Chromalloy filed its protest, the court granted GE's motion to intervene.
Then, during the initial scheduling conference, the parties indicated that Chromalloy might seek
to supplement the administrative record, and that such a motion should be resolved before the
parties briefed the merits of the protest.  Thus, as proposed by the parties, the court adopted an

expedited schedule for considering supplementation of the record, such that decisions regarding supplementation and the protest's merits could be issued prior to the end of the fiscal year—September 30, 2019.

Pursuant to the agreed-to schedule, Chromalloy moved to supplement the administrative record on July 25, 2019, defendant and GE responded to Chromalloy's motion on August 5, 2019, and Chromalloy filed a reply in support of its motion on August 8, 2019.  Having considered the parties' submissions, the court is prepared to rule.

## II.  DISCUSSION

Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973).  An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review.  See id. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").  In the bid protest context, the administrative record in the United States Court of Federal Claims must also include certain documents from a predecessor GAO protest, 31 U.S.C. § 3556 (2012), including the contracting agency's "complete report (including all relevant documents) on the protested procurement," id. § 3553(b)(2), and "any decision or recommendation of the Comptroller General," id. § 3556.

Ultimately, "[t]he task of the reviewing court is to apply the appropriate [Administrative Procedure Act] standard of review to the agency decision based on the record the agency presents to the reviewing court."  Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) (citation omitted).  "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'"  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).  Consequently, the administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the" applicable standard.  Id. at 1381; accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the 'omission of extra-record evidence precludes effective judicial review.'" (quoting Murakami, 46 Fed. Cl. at 735)).

### A.  Chromalloy's Motion

In the introduction to its motion, Chromalloy provides a succinct explanation for its request to supplement the administrative record:

> [T]he Air Force funded GE's development of the TF39 aircraft engine; GE turned the TF39 aircraft engine into the LM2500 marine engine to use in ships for the Navy; and the Navy continued to contribute funds to improve LM2500 marine engine.  Finally, somewhere along the line, GE found a commercial market for the

LM2500 engine and began selling it to private marine companies and industrial power plants.  This history is important because the Government's rights to technical data relating to an item—including aircraft and ship engines—generally turn, at least in the first instance, on whether the Government contributed to its development.  And this protest turns on whether the Navy has the rights to share technical data related to the LM2500 engine with its contractors.

. . .  Meanwhile, the record lacks a single document showing a single dollar of development money or even a single complete contract allocating technical data rights between the Government and GE.

Mot. 1-2.  Chromalloy relies on publicly available evidence—including "GE's marketing materials, government-sponsored research, and Congressional testimony," id. at 1—to support its factual contentions.  See, e.g., Mot. App. 19 ("[T]he TF-39 engine [was] developed under the military program.  The TF-39 engine contract was awarded in 1965. . . .  The Government invested $212 million in the development of the TF-39 engine."), 31 (indicating that the government awarded contracts to "increase the performance margins of the TF39 engine" in 1969 and 1972), 57-58 ("The LM 2500 Gas Turbine Program is being funded at $19.4 million in FY 1979, an increase of $1.4 million over the FY 1978 level. . . . Effort will also be directed toward the Component Improvement Program (CIP) ($9.1 million) to provide the engineering support required to develop improvements to increase the reliability of the engine."), 71 ("The LM2500 is actually a marine/industrial version of the military TF39 aircraft engine.  With exception of the TF39 high bypass fan section, the two engines are very similar—with about 35 percent of the LM2500 parts interchangeable with TF39 parts.  Other parts and components, although not interchangeable, are similar in design and require the same types of maintenance equipment and artisan skills to repair."), 75 ("The LM2500 marine gas turbine is . . . [d]erived from GE's TF39 and CF6-6 aircraft engines . . . .").

In support of its legal contention that the government's rights to technical data depends on whether the government contributed to the development of the item at issue, Chromalloy articulates "four basic principles" adopted by the United States Department of Defense by 1965 that guide the procurement of "intellectual property rights in technical data created or delivered by its contractors."  Mot. 3.  First, if the government contributes to the development of an item, it receives certain rights in the technical data—under the current standard contract clause, the government receives either "government purpose rights" (in cases of mixed funding) or "unlimited rights" (when the item is fully funded by the government) and "can disclose the technical data to its contractors for non-commercial purposes."  Id. (relying on DFARS 252.227-7013 and DFARS 227.7103-5); see also id. (noting that the predecessor standard contract clause provided for only "unlimited rights").  Second, even if the item is developed by a contractor exclusively at private expense, the contractor must provide the government with "'unlimited rights' to technical data that is 'necessary for operation, maintenance, installation[,] or training . . . .'"  Id. at 4 (quoting DFARS 252.227-7015(b)(iv)).  Third, contractors must "follow appropriate procedures to maintain" limits on the government's rights.  Id.  Fourth, the government's rights to technical data are not dependent on "whether that technical data was delivered."  Id.

According to Chromalloy, supplementation of the administrative record is necessary to allow the court to adequately review "three critical assumptions made by the Navy [as identified during the second GAO protest] for which the record lacks any evidence," id. at 15: (1) "the Navy's assumption that GE provided the technical manuals to the Navy only voluntarily rather than under a procurement contract or subcontract," id.; (2) "the Navy's assumption that GE developed the LM2500 entirely at its own expense," id. at 16; and (3) the Navy's assumption "that any technical data involved in this procurement would [not] fit one of the contractual unlimited rights categories," id. at 17. Chromalloy also contends that supplementation is necessary for the court to evaluate the accuracy of the representations made by GE that formed the basis for the Navy to issue Amendment 6, including the statement that GE's "contracts, as has been the case since the LM2500 Gas Turbine was first offered for sale to the Navy in 1969, are subject to DFARS 252.227-7015 'Technical Data Commercial Items,'" id. at 18-19 (quoting GE's January 10, 2019 letter), and the statement that GE "developed the LM2500 engine 'solely at GE expense,'" id. at 20 (quoting Ms. Widmann's October 31, 2018 e-mail message).

Consequently, Chromalloy seeks to supplement the administrative record with three categories of documents:

- "All contracts with or subcontracts for the U.S. Government that included the development, improvement, modification, delivery, or installation of the LM2500 or any of the engines from which it was derived (e.g., the CF6 or TF39)." Id.

- "If any of the contracts identified above includes any assertions stating that the Government is entitled to less than unlimited rights, provide copies of at least the cover pages of the deliverables for which GE asserted less than unlimited rights." Id. at 22.

- "Documents sufficient to show who funded the development of LM2500, including the engines from which it was derived (e.g., CF6 and TF39)." Id.

### B. Defendant's and GE's Responses

Defendant opposes any supplementation of the administrative record. It asserts that a determination of who owns the rights to the technical data encompassed within the Navy's technical manuals and service bulletins is irrelevant to resolving Chromalloy's protest, which (as relevant to the instant supplementation motion) is a challenge to solicitation requirements as unduly restrictive. Defendant observes that such challenges are reviewed under a highly deferential legal standard and contends that the existing administrative record is sufficient for effective judicial review under that standard. In conjunction with this argument, defendant asserts that the three Navy assumptions identified by Chromalloy, as well as Chromalloy's contentions regarding GE's purported misrepresentations, are untrue or irrelevant.[4] Defendant

---

[4] Defendant also argues that supplementation of the administrative record is unnecessary because Chromalloy cannot demonstrate that the challenged solicitation requirements are unduly restrictive. The court declines to address this contention because it would require the court to

avers that Chromalloy's failure to address the applicable legal standard betrays its true motive for filing its protest: "to save money by gaining access to the technical data without applying to be a GE license IV holder." Def.'s Resp. 2. Finally, defendant argues that Chromalloy's supplementation request is overly broad, and that if supplementation is permitted, it should be narrowly tailored to be proportional to the dispute.

GE also opposes Chromalloy's request for supplementation of the administrative record. It echoes defendant's contention that the existing administrative record is sufficient for the court to effectively review Chromalloy's claim that the Navy lacked "a rational basis for restricting the procurement to only offerors who have independent access to GE's manuals." GE's Resp. 10. In addition, GE contends that "Chromalloy fails to show any need to supplement the record," id. at 13, specifically addressing the three Navy assumptions and the purported inaccuracy of GE's statements.

### C. Chromalloy's Reply

In its reply, Chromalloy contends that the responses filed by defendant and GE "only confirm the need for a more complete record." Reply 1. Specifically, Chromalloy contends that the responses demonstrate that the existing administrative record lacks any evidence that the Navy investigated the rights it possessed in the technical data related to the LM2500 PBT Gas Generator. In addition, it dismisses an argument raised by defendant and GE concerning the Navy's assumption that GE developed the engine at its own expense—that if GE paid for even one part of the engine, then the disclosure of any technical data was improper.

More generally, Chromalloy questions why the Navy would want to spend taxpayer dollars—through the increased price it would pay for overhaul services to contractors needing to account for the cost of a GE Level IV license—for technical data that it already owns. It asserts that the CICA was enacted to "eradicate" such "waste," and that a bid protest is the proper mechanism for enforcing the CICA. Id. Thus, Chromalloy contends, the court must review "why the Navy departed from its past practice, caved to GE's threats, and amended an active competition to restrict competition to only those companies that first paid—and would thus be passing along to the Government—the cost of a GE license the Government already has." Id.

### D. Analysis

To determine whether supplementation of an administrative record is appropriate, the court must ascertain whether the record is adequate to address the merits of case under the applicable legal standard. Thus, the court first examines Chromalloy's allegations and identifies the legal standard that applies to those allegations.

Chromalloy's supplementation motion relates to Count I of its complaint, in which it alleges that the solicitation requirement that offerors independently obtain GE's technical manuals and service bulletins for the LM2500 PBT Gas Generator unduly restricts competition

---

rule on the merits of Chromalloy's protest without the benefit of full merits briefing from the parties.

in violation of the CICA because the Navy has the necessary rights to share with its contractors the technical data included in GE's technical manuals and service bulletins.  In short, Chromalloy contends that the Navy lacked a rational basis for including the requirement in the solicitation.  It is well settled that the court reviews such contentions "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," and the protestor "bears a heavy burden of showing that the" solicitation requirement "had no rational basis."  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010) (providing that a protestor has the "burden of showing that the agency's decision . . . is so plainly unjustified as to lack a rational basis").  Indeed, when the protest concerns a contracting agency's determination of its minimum needs, the "agency's preferences are entitled to great weight."  Savantage, 595 F.3d at 1286.  Thus, the question before the court is this:  Is the existing administrative record sufficient to decide whether the Navy provided a "coherent and reasonable explanation" for its determination of its minimum needs—that the overhaul of LM2500 PBT Gas Generators needed to be performed by a contractor possessing a GE Level IV license or having access to GE's technical manuals and service bulletins?

Chromalloy argues that the administrative record is insufficient to evaluate the Navy's determination because the record lacks any evidence that the Navy assessed whether it possessed rights to the technical data included in its own manuals such that it could open the competition to contractors who did not have access to GE's technical manuals and service bulletins. Chromalloy asserts that if the administrative record was supplemented with documentation regarding the Navy's rights to the technical data, then the court could assess whether the Navy had rights to the data and, if it did, conclude that there was no justification for requiring contractors to possess independent access to the data.

Contrary to Chromalloy's assertion, a determination of the technical data rights that the Navy actually possesses is not necessary to resolve the Chromalloy's protest.  Rather, in assessing whether the Navy's minimum-needs determination had a rational basis, the court need only decide whether the Navy was required to ascertain the rights it possesses when determining its needs and, if so, whether it engaged in such efforts and whether any such efforts were adequate.[5]  The first issue is a legal question, and the existing administrative record includes evidence relevant to the other issues.[6]  See, e.g., AR 137-39 (portion of the Navy's report to the GAO during Chromalloy's second protest), 482-87 (correspondence between the Navy and GE

---

[5]  These issues are relevant only if the court concludes that it is "plainly unjustified" for the Navy to require a contractor to have independent access to GE's technical manuals and service bulletins if the Navy possesses the necessary technical data rights such that it could provide its manuals to its contractors.

[6]  Notably, the administrative record does not include an analysis by Mr. McGuire, or anyone else at the Navy, in support of the Navy's conclusions, set forth in its report to the GAO, that "the manuals, although titled 'Navy Technical Manuals,' contain inextricable GE proprietary information that has been incorporated over many years" and that "[t]his information cannot be released to non-GE Level IV Licensed offerors without GE authorization."  AR 137.

-17-

in October and November 2018), 528-32 (correspondence between the Navy and GE in January 2019), 543-45 (correspondence between the Navy and GE in December 2018), 1184-85 (portion of the GAO's decision).[7]  Consequently, there is no need to supplement the administrative record with the materials requested by Chromalloy.

## III.  CONCLUSION

Accordingly, the court **DENIES** Chromalloy's motion to supplement the administrative record.  The parties shall confer, and then **by no later than Tuesday, August 27, 2019**, file a joint status report that sets forth a proposed schedule for briefing cross-motions for judgment on the administrative record and at least three proposed dates for oral argument.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Tuesday, September 3, 2019**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on July 10, 2019, to file redacted versions of protected documents for the public record.  If the parties have not filed redacted versions of the supplementation motion and related briefs by **Tuesday, September 3, 2019**, they shall file a joint status report by that date explaining the reason for the delay.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge

---

[7]  The Navy's report and the GAO's decision are part of the administrative record pursuant to 31 U.S.C. §§ 3553(b)(2), 3556.