# In the United States Court of Federal Claims

No. 19-974C
(Filed Under Seal: November 8, 2019)
(Reissued for Publication: November 18, 2019)[*]

*******************************************

| | | |
|---|---|---|
| CHROMALLOY SAN DIEGO CORPORATION, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Bid Protest; Proper Contents of the |
| | * | Administrative Record; Cross-Motions for |
| THE UNITED STATES, | * | Judgment on the Administrative Record; |
| | * | Challenge to Solicitation Requirements; |
| Defendant, | * | Technical Data Rights; Standing; Waiver |
| | * | |
| and | * | |
| | * | |
| GENERAL ELECTRIC COMPANY, | * | |
| | * | |
| Defendant-Intervenor. | * | |

*******************************************

Paul F. Khoury, Washington, DC, for plaintiff.

William J. Grimaldi, United States Department of Justice, Washington, DC, for defendant.

Jason A. Carey, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

This bid protest concerns the acquisition of marine engine overhaul services by the Naval Surface Warfare Center ("Navy"). The engine at issue, the LM2500 gas turbine engine, is manufactured by defendant-intervenor General Electric Company ("GE"). Plaintiff Chromalloy San Diego Corporation ("Chromalloy") challenges two solicitation requirements—that offerors possess independent access to GE technical manuals and service bulletins, and that offerors have access to certain GE-manufactured special tools—and, through a supplemental complaint, the Navy's evaluation of its proposal with respect to a third solicitation requirement—that offerors

---

[*]  This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on November 15, 2019. The redactions are indicated with bracketed ellipses ("[. . .]").

have access to GE-certified spare parts.  Currently before the court are Chromalloy's motion to strike a portion of the administrative record filed by defendant or, in the alternative, to supplement the administrative record, and the parties' cross-motions for judgment on the administrative record.  For the reasons set forth below, the court denies both of Chromalloy's motions and grants defendant's and defendant-intervenor's cross-motions.

## I.  BACKGROUND

### A.  LM2500 PBT Gas Generators

The LM2500 gas turbine engine manufactured by GE "is the primary propulsion gas turbine engine on the DDG-51, CG-47, FFG and LCS-2" ship classes.[1]  AR 599; accord id. at 1294.  The Navy uses two variants of the engine:  the Paired Blade Turbine ("PBT") configuration and the Single Shank Turbine ("SST") configuration.  Id. at 599.  To meet the demand for the engines at issue in this protest—the LM2500 PBT Gas Generators—and ensure mission readiness, the Navy maintains a pool of spare engines that have been overhauled.  Id. at 1294.  Prior to May 2017, the Navy overhauled the engines at the Fleet Readiness Center Southwest in North Island, California.  Id. at 1257.  However, that facility ultimately was unable to satisfy the Navy's annual requirement of twelve spare engines.  Id. at 1294.  Thus, in May 2017, the Navy awarded two two-year indefinite-delivery, indefinite-quantity, firm-fixed-price contracts for the necessary overhaul services.  Id. at 1257.

### B.  Original Solicitation

Soon thereafter, the Navy began preparations to procure overhaul services upon the expiration of those contracts.  See, e.g., id. at 1188, 1224-25.  It determined that the overhaul services were a commercial item, id. at 1199, and that it would procure the overhaul services through full and open competition, id. at 1224, 1229, 1298.

Ultimately, on August 28, 2018, the Navy issued solicitation N64498-18-R-4023, id. at 143, to procure "commercial depot-level overhaul" services for LM2500 PBT Gas Generators used by the Navy, the United States Coast Guard, the National Sealift Command, and foreign military navies, id. at 145.  See also, e.g., id. at 143, 179, 185, 210, 230 (reflecting that the solicitation was for a commercial item).  The Navy sought to award one or more indefinite-delivery, indefinite-quantity, firm-fixed-price contracts, with the ordering period under those contracts to span sixty months.  Id. at 146.  Overhaul services would be ordered through task orders, up to a cumulative ceiling of $70 million.  Id.

---

[1]  The court derives the facts in Part I from the administrative record ("AR").  The administrative record includes material submitted and created during proceedings before the Government Accountability Office ("GAO") and documents submitted by defendant at the close of briefing.  As explained in more detail below, see infra Section II.A, the court's factual recitation includes information from some of those materials.

One of the key requirements in the solicitation was that offerors be GE Level IV licensed commercial depots. Id. at 146, 148, 242. This requirement originated in the Individual Streamlined Acquisition Plan prepared by the Navy prior to the issuance of the solicitation:

> Only GE Level IV licensed facilities may perform this level of overhauls. The GE Level IV licensing agreement between GE and the particular depot sets the guidelines for the depot facility to work on GE designated engine models, including the LM2500. It establishes terms and conditions to use GE's intellectual property and provisions (e.g., quality requirements) to accomplish repair and test of GE designated engine models. This certification standard determines the types of repairs that the depot can perform under GE's guidance and authorization/control. This is the mechanism for the facilities to buy only GE-approved gas turbine components for engine repairs and overhauls to ensure that no unauthorized or aftermarket type parts are being used.

Id. at 1295. The Navy also explained the need for such a requirement to offerors in Amendment 1 to the solicitation, issued on October 4, 2018:

> GE Level IV licensed commercial depots have direct access to [original equipment manufacturer ("OEM")] (GE) certified parts that are listed in the Navy LM2500 manual Illustrated Parts Breakdown (IPB). These GE certified parts are necessary for our Navy application. Use of a non-GE Level IV overhaul depot is not authorized by [the Navy] because uncertified overhaul depots may obtain parts from aftermarket sources with no point of origin to evaluate the pedigree of the components. GE Level IV licensed commercial depots have access to GE (OEM) technical support, as needed. GE will not support questions for engines under repair at uncertified depots. Level IV licensed OEM depots also have access to certified vendor support for individual component repairs which have been independently validated to meet OEM specifications.
>
> This is not a new requirement, as it was included in the previous procurement solicited under N64498-18-R-5015 by this contracting office.

Id. at 244.

The Navy's presolicitation market research had revealed that there were nine GE Level IV licensed commercial depots, id. at 1297, three of which were potential offerors, id. at 1189. Chromalloy was not identified as possessing a GE Level IV licensed commercial depot, id. at 1297, or as a potential offeror, id. at 1189. However, the Navy had previously found Chromalloy qualified to overhaul LM2500 engines despite Chromalloy's lack of a GE Level IV license. See, e.g., id. at 1732 (indicating that although Chromalloy was not awarded three contracts related to the LM2500 engine, the Navy found Chromalloy "to meet the criteria stated in the solicitations," such as being "an established overhaul depot technically capable in commercial overhaul"; and further indicating that Chromalloy has served prior Navy contracts, held many small LM2500-related contracts, and "overhauled engines commercially for the County of Los Angeles, Signal Hill, Gasaway Engineer LLC, PDVSA, AAR Aircraft Turbine Center, and the Indonesian

Navy"), 1740 (indicating that Chromalloy was a subcontractor on two Navy contracts "to disassemble LM2500 engines"), 1838 (explaining that (1) "[h]istorically, [Chromalloy has] performed numerous commercial and industrial PBT overhauls," (2) "[t]o date, [Chromalloy has] not been awarded a 'full overhaul' contract with the US Navy," and (3) Chromalloy had addressed, and been found "technically acceptable" under, the following criteria:  (a) "prior experience in overhauling LM2500 gas generators or similar item for industrial or marine applications"; (b) "facilities and capabilities to clean, inspect, and repair gas generator components in accordance with US Navy LM2500 depot level technical manual"; and (c) "ability to overhaul gas generator accessories in accordance with US Navy LM2500 depot level technical manual"); cf. id. at 1466 (reflecting that GE and Chromalloy Gas Turbine LLC were parties to a Component Repair License Agreement "relating to the component repair of selected components for industrial and/or commercial marine . . . LM2500 . . . gas generators and/or gas turbines").

In light of the discrepancy between its prior experience with the Navy and the solicitation's licensure requirement, on October 10, 2018, Chromalloy lodged a protest at the GAO to challenge the licensure requirement as anticompetitive.  Id. at 1303-513.  In response, the Navy took corrective action by issuing Amendment 3 to the solicitation, effective November 6, 2018, id. at 247, in which it eliminated the requirement that offerors be GE Level IV licensed commercial depots, compare id. at 148 (original solicitation), with id. at 250 (Amendment 3).  The Navy also added the requirements that an offeror lacking a GE Level IV license demonstrate that it had "access to the current OEM LM2500 Overhaul and Repair Manuals," "access to the most recent OEM technical repair procedures and service bulletins for the LM2500 gas generator," "the ability to provide genuine OEM-certified LM2500 parts," and ownership of or access to specified special tools.[2]  Compare id. at 240-41 (original solicitation), with id. at 268 (Amendment 3).

### C.  The Navy's Initial Correspondence With GE

During the pendency of Chromalloy's GAO protest, the Navy and GE engaged in discussions regarding the GE Level IV licensure requirement.  Id. at 482-87.  On October 31, 2018, Cate Widmann, a GE senior contract manager, responding to questions posed by Brian D. McGuire, the Navy's contract specialist, advised:

(1)  The Service Provider Letter and LM2500 [Authorized Service Provider] Obligations document . . . spell out the obligations placed on the licensee by GE which are required to comply with GE's stringent commercial quality control processes and allow GE warranties on its OEM parts to remain valid.

(2)  [T]here is no formal license agreement between GE and the US Navy outside of [Federal Acquisition Regulation ("FAR")/Defense Federal Acquisition

---

[2]  As reflected below, the technical manual and service bulletin access requirements added in Amendment 3 to the solicitation were removed with Amendment 5 to the solicitation. Compare AR 268 (Amendment 3), with id. at 280 (Amendment 5).

> Regulation Supplement ("DFARS")]/Agency specific clauses; however, GE works closely with the Navy depots to ensure that they are certified, through other means.  Notably, GE sells OEM spare parts directly to various [United States Department of Defense] agencies, including [the Defense Logistics Agency,] for use by the Navy depots.  GE provides, pursuant to . . . DFAR[S] 252.227-7015, limited commercial data rights with regard to LM2500[] (a commercial product developed solely at GE expense) to the Navy which govern use of all GE Intellectual property including GE IP contained in GE manuals and US Navy manuals including updates as published – benefits only provided to authorized service providers.  Other clauses, contained in specific, negotiated contracts with the Navy, work to ensure GE OEM engineering and technical support are provided to the Navy under terms which are equivalent to or exceed[] that contained commercial depot license agreements.

Id. at 484.  Ms. Widmann also suggested that a telephone call "would be beneficial" in that it "might help expedite the information gathering process for both parties."  Id.

Mr. McGuire responded the following day to suggest "a quick call for some informal information gathering[.]"  Id. at 483.  The telephone call apparently occurred since Ms. Widmann forwarded an Authorized Service Provider document to Mr. McGuire "per [their] discussion."  Id.  One week later, on November 8, 2018, Ms. Widmann requested an update from Mr. McGuire, to which Mr. McGuire responded:  "Issue is resolved."  Id. at 482.

### D.  Solicitation Through Amendment 5

After the Navy issued Amendment 3 to resolve the GAO protest, it twice more amended the solicitation before the December 11, 2018 due date for proposals.  Id. at 271-82.

### 1.  Statement of Work

As amended, the solicitation included a statement of work in which the Navy set forth detailed requirements for the work to be performed under the contract.  Id. at 249-62.  In general:

> The Contractor shall overhaul, modify, incorporate mandatory updates, maintain standard configuration integrity, assemble, test, preserve, package, document, mark and prepare for shipment the LM2500 PBT gas generator in accordance with this specification.

> All overhaul work performed under this specification shall be in accordance with the current US Navy LM2500 depot level technical manuals . . . .  Any and all deviations from these technical manuals must be approved, in writing, by the cognizant technical representative . . . .

Id. at 250.  In addition to dictating the procedures for overhauling the engines, the Navy described the parts that awardees could use for the overhaul work:

The Contractor shall supply and only use US Navy approved parts in the overhaul of US Navy LM2500 PBT gas generator.  All approved parts for use in US Navy LM2500 PBT gas generator are listed in the US Navy LM2500 Illustrated Parts Breakdown [in the technical manuals].  The use of aftermarket parts is not permitted.

Id. at 251.

Finally, the Navy represented that it would provide awardees with three of its "Organizational Level" technical manuals and six of its "Depot Level Maintenance" technical manuals.  Id. at 249-50; see also id. at 449-54, 464-66 (containing cover sheets for the technical manuals identified in the solicitation).  The organizational level manuals are used by sailors when performing routine maintenance on the engines while aboard a ship, and the depot level maintenance manuals are used when overhauling an engine (disassembly, refurbishment, rebuilding, and testing) in a repair depot.  Id. at 933-34.  The "baseline information" in the depot level maintenance manuals was provided to the Navy by GE "many years ago," and at some time thereafter, GE began to provide the Navy with additional technical information on a quarterly basis.  Id. at 945, 947; see also id. at 946-47 (indicating that GE is not under a contractual obligation to provide the quarterly updates).  The Navy then incorporates the information it deems necessary into its manuals.  Id. at 945-48.

The cover sheet for each technical manual includes a distribution statement substantially identical to the following:  "DISTRIBUTION STATEMENT C:  DISTRIBUTION AUTHORIZED TO U.S. GOVERNMENT AGENCIES AND THEIR CONTRACTORS; ADMINISTRATIVE/OPERATIONAL USE; 31 MAR 1996.  OTHER U.S. REQUESTS FOR THIS DOCUMENT SHALL BE REFERRED TO NSWC PHILADELPHIA, CODE 314."[3]  Id. at 450; accord id. at 449, 451-54, 464-66.  Although the distribution statement allows for the disclosure of the manuals to contractors, the Navy restricts the distribution of the manuals, particularly the depot level maintenance manuals, because they contain proprietary information.  Id. at 937; see also id. at 938 (explaining that without the proprietary information from the depot level maintenance manuals, it would be impossible to overhaul the engines), 939-40 (explaining that since the Navy began awarding commercial repair contracts five to seven years ago, it has provided its manuals to contractors, but that in all but one case, those contractors held a GE Level IV license).  This practice is longstanding; Matthew Driscoll, the lead engineer for the Navy's LM2500 program who has worked in the LM2500 group since 1987, id. at 925, knew "from working with the OEM over the years" that the Navy's technical manuals include proprietary information, id. at 937.

---

[3]  Three of the statements specified a different date, AR 449 (February 15, 2007), 453-54 (September 30, 2010), and one of the statements included a slightly different second sentence, id. at 449 ("OTHER REQUESTS FOR THIS DOCUMENT SHALL BE REFERRED TO NAVAL SEA SYSTEMS COMMAND (SEA-09B2).").

### 2.  Proposal Contents

The Navy directed offerors to submit their proposals in two volumes—one with the offeror's proposal documents and one with the offeror's technical proposal.  Id. at 266.  With respect to the technical proposal, the Navy set forth the following requirements in section L.3.2 of the solicitation:

> An Offeror must provide either a copy of a current GE Level IV License or, in the alternative, provide detailed information which clearly and completely addresses the following:
>
> a.  Spare Parts Access:  The Offeror shall demonstrate it has the ability to provide genuine OEM-certified LM2500 parts and assemblies as required during the overhaul and repair processes.
>
> b.  Special Tooling:  The Offeror shall demonstrate it owns or has access to all necessary special tools required to completely disassemble, overhaul, and reassemble LM2500 gas generators.  The Special tooling that must be addressed [includes twenty-three items identified by "Special Tooling Number" and "Special Tooling Description."]
>
> c.  Testing:  The Offeror shall demonstrate it possesses an active Large Turbine Test Cell in accordance with Paragraph C.3.2 of the Statement of Work . . . .
>
> d.  Quality:  The Offeror provides a current ISO 9001 quality assurance program certification.

Id. at 280-81; see also id. at 949 (indicating that Mr. Driscoll, in choosing "the most critical tools" from a thirty-page list to identify in the solicitation, selected tools used to test the engines after they had been rebuilt, tools used to safely handle the engines, and tools to "measure critical clearances within the engine[s]"), 952-53 (indicating that the Navy purchases its special tools from a company that has "the proprietary information to build the tools to the standards that are required by the OEM" and that "during the construction and manufacture of those tools, . . . those tools go through testing phases and that all of the right specifications . . . are met"), 1067 (reflecting that the day before the Navy issued Amendment 3 to the solicitation, Mr. Driscoll reviewed the list of "1000+" special tools needed to overhaul an LM2500 PBT Gas Generator and pared it down to twenty-three special tools he considered to be "the most important").  But see id. at 303-37 (setting forth the required special tools listed in one of the Navy's technical manuals, with fifteen pages listing the tools in numerical order and twenty-one pages listing the tools by tool group (certain tools appear in more than one group), and reflecting that there was a total of approximately 537 special tools).

### 3.  Proposal Evaluation

The Navy indicated in the solicitation that it intended to award contracts to those offerors that were "determined to be a responsible source," that "submit[ted] a technically acceptable proposal that conform[ed] to the requirements of this solicitation," and that "the Government ha[d] no reason to believe would be likely to offer other than fair and reasonable pricing." Id. at 281.  As relevant in this protest, technical acceptability, which would "be determined based on information submitted in the Technical Proposal," required an offeror to provide the information set forth "in Section L.3.2 and be rated acceptable" for the technical factor.  Id.  In other words, an offeror was required to:

      (1)  Possess a current GE Level IV License or;

      (2)  Provide all of the information required in Section L.3.2 and clearly demonstrate that it has the capability provide OEM-certified parts, [has] access to the special tooling identified in L.3.2.b, possess[es] a test cell in accordance with Section C.3.2, and [has] a current ISO 9001 quality assurance program certification.

Id.  The Navy reserved the right to hold discussions and request final proposal revisions.  Id. at 282.

### E.  Questions and Answers

Before the proposal due date, the Navy fielded several questions regarding the terms of the solicitation and provided its responses in amendments to the solicitation.  Id. at 244, 274-75. As relevant to this protest, Amendment 5 to the solicitation, effective November 29, 2018, id. at 273, included the following questions and answers:

Question 2:  Would the submittal [of an offeror with experience comparable to Chromalloy's] be evaluated on an equal footing with a GE Level IV-based proposal?

Answer 2:  Factor 1 – Technical will be determined as Acceptable/ Unacceptable in accordance with the criteria as defined in Section L.  Offerors with a GE Level IV license will be determined Acceptable; offerors without the GE Level IV license must provide information in accordance with Section L.3.2 for technical evaluation to determine acceptability.

Question 3:  How and when are US Navy technical manuals (which the Navy provides to the Contractor) updated with Service Bulletin . . . requirements . . . ?

> Answer 3:  The latest revision of [the Navy's technical] manuals will be provided to the Contractor at the time of contract award.  The Navy evaluates OEM [service bulletins] and incorporates them annually, as deemed necessary, into Navy technical documents.

> Question 4:  A prospective bidder was previously determined technically acceptable on a different procurement by the US Navy for the overhaul of LM2500 gas generators to include Single Shank, Paired Blade Turbine and Power Turbine assemblies.  Would demonstration of prior acceptability meet the technical criteria?

> Answer 4:  No.  All offerors must submit the required information as detailed in the solicitation, including technical evaluation criteria as outlined in Sections L & M, to be considered for Contract award.

Id. at 274-75.

### F.  Chromalloy's Proposal

Chromalloy was one of three offerors, id. at 1698, that timely submitted a proposal, id. at 1520-697.  The two other offerors—the incumbent contract holders, id. at 1725—were "licensed by the OEM to perform depot-level overhauls," but Chromalloy was not, id. at 1724.  Thus, in its technical proposal, Chromalloy "provided information to address the alternative criteria" set forth in section L.3.2 of the solicitation.  Id. at 1727.

### G.  The Navy's Second Round of Correspondence With GE

On December 14, 2018, three days after the proposal due date, W. Hartmann Young, a senior counsel for GE, sent a letter to counsel for the Navy, Howard B. Rein, requesting "immediate action" regarding the solicitation.  Id. at 543.  Specifically, he wrote:

> It has come to our attention that the Navy has amended the Solicitation to potentially allow for award to offerors without [a] GE Level IV license.  Entertaining such a possibility is ill-considered and beyond Navy authorization for a number of reasons.  First, offerors lacking a GE Level IV license cannot demonstrate that they have the right to provide GE-certified parts to the Navy, and any suggestion to the contrary is false.  Second, the use of other than GE-certified parts will void any warranty protections currently applicable to the fielded and future LM2500 engines.  Third, if the Navy provides its technical manuals lacking the appropriate GE license, the Navy will be breaching its contractual commitments already made to GE and will be violating GE's intellectual property rights.  Fourth, entertaining an award to unlicensed offerors will irreparably undermine what has been a mutually advantageous relationship between the Navy and GE on the LM2500.

. . . .

GE respectfully requests that you immediately cease the consideration of offerors lacking a GE Level IV license, and that you do not award a contract to any offeror lacking such a license.  GE also asks for an immediate meeting on the issues raised in this letter.

Id. at 543-45; accord id. at 544 ("You are on notice that every contract by which GE has provided the LM2500 to the Navy has been with limited rights since GE first sold the LM2500 to the U.S. Government.  GE over this time has provided large amounts of technical data and other intellectual property to the Navy in support of the LM2500, but always appropriately marked as limited rights data.  This means that you cannot provide GE technical data to GE's competitors or, as is the case here, to companies lacking the appropriate license, without breaching your contractual commitments to GE.  See, e.g., DFARS 252.227-7015."); see also id. at 716 (reflecting that GE marked a "Gas Turbine Troubleshooting, Schedule Maintenance, and Corrective Maintenance" manual issued on May 15, 2001, and updated on December 30, 2017, as "GE proprietary information" that "is disclosed in confidence" and should not be disclosed without GE's "express written consent"), 718 (reflecting that GE marked a service bulletin issued on May 24, 2017, and revised on June 27, 2017, as "GE proprietary information" that "is disclosed in confidence" and should not be disclosed without GE's "express written consent").

The Navy initially agreed to meet with GE during the week of January 14, 2019, but subsequently cancelled the meeting on January 8, 2019, explaining:

"Although we are not opposed to meeting with you and do welcome the chance to speak with you, presently, to protect the integrity of the ongoing procurement, and while we are in the process of evaluating offers, it does not seem appropriate for us to communicate concerning the matter until the conclusion of this competition."

Id. at 531 (quoting the Navy's correspondence).  Mr. Young therefore sent another letter to Mr. Rein on January 10, 2019,[4] id. at 530-32, writing:

---

[4]  While Mr. Young was corresponding with the Navy personnel involved in the procurement at issue, David Nelson, the director of Sales and Business Development for GE Aviation, sent a letter on January 11, 2019, to two Navy program managers requesting their "urgent assistance."  AR 546.  He wrote that the Navy was

on the brink of willfully violating GE LM2500 Intellectual Property rights and breaching contractual provisions, with potentially serious impact to ongoing GE support of the USN LM2500 fleet.  Repeated appeals to the [Navy's legal] team to stop this activity pending discussion on the matter have been rebuffed.  I request that you immediately intercede on our behalf.

Id.  He further warned:

-10-

I am writing on behalf of GE Marine (GE) to urgently request that the [Navy] suspend activities that could lead to one or more contract awards to unlicensed vendors bidding under the referenced solicitation, and to renew our request for a meeting to discuss this request. By proceeding on its current course, the [Navy] is jeopardizing GE proprietary information related to the LM2500 engine, which [the Navy] and its personnel, respectively, are contractually and legally barred from sharing with third parties. In short, if [the Navy] awards a contract to an unlicensed vendor, it will place the Navy in breach of several of its existing contracts with GE.

Id. at 530. He referred to his December 14, 2018 letter, and expanded:

[I]f the [Navy] selects an unlicensed vendor, it would be compelled to violate contractual commitments to GE and statutory obligations that apply to Executive Branch employees, including the Trade Secrets Act, 18 U.S.C. § 1905. This is because those manuals contain GE proprietary information related to GE's LM2500 engines, the servicing of which is the subject of the referenced solicitation. GE has only ever provided the Navy technical information related to the LM2500 with narrowly circumscribed technical data rights pursuant to contracts, or otherwise with a proprietary information legend. These contracts, as has been the case since the LM2500 Gas Turbine was first offered for sale to the Navy in 1969, are subject to DFARS 252.227-7015 "Technical Data Commercial Items". No LM2500 Gas Turbine has been sold to the [Navy] directly or through a prime shipyard contract with other than the limited commercial data rights described in that DFARS clause. . . . In short, the [Navy] is not authorized to share GE's proprietary and technical information – whether in the form of a GE Marine manual or as part of a separate Navy manual – with a third party without GE's consent.

Id. at 531. He therefore renewed GE's request for an immediate meeting with the Navy "to address this situation." Id.

The Navy acknowledged receipt of Mr. Young's letter and indicated that it intended to complete the competition. Id. at 528-29. However, it noted that it did "not intend to release any

---

GE will need to radically alter the way it conducts business with the Navy should [it] elect to violate commitments to protect GE's intellectual property. Should the Navy, departing from longstanding practice, decide to no longer protect GE Proprietary Information, it will impact all LM2500 technical exchange with the Navy, including technical data, operational data, maintenance manuals, depot support, service bulletins, part/component updates, and engineering design data. Collaboration on product improvements and technology upgrades would also be at risk.

Id. at 546-47. The administrative record does not include any response to this letter.

alleged proprietary information to vendors lacking a GE license prior to meeting with [Mr. Young] to discuss any and all relevant concerns." Id. at 529.  Approximately two weeks later, the Navy further advised Mr. Young that he would be contacted immediately after the competition had concluded.  Id. at 528.

## H. The Navy's Consideration of GE's Contentions

Although it declined to meet with GE during the competition, the Navy took under advisement GE's contentions that providing technical manuals to companies without a GE Level IV license would violate the Trade Secrets Act and GE's intellectual property rights.  Id. at 137. It researched its prior contracts, located five contracts from within the last twenty years through which it had purchased LM2500 engines, and ascertained that none of those contracts required GE to provide the Navy with technical manuals or service bulletins.[5]  Id. at 891-93; see also id. at 548-714 (containing the five referenced contracts).  In addition, it investigated the material it received from GE—information from which is incorporated into the Navy's technical manuals— and determined that it is all marked as GE proprietary information.  Id. at 893-94, 911-12; accord id. at 138 ("Information contained in the Navy's Technical Manuals originates, in part, from GE's Service Manuals, Service Bulletins, and [changes in design] and is proprietary to GE. . . . All service information provided by GE is marked proprietary with restrictive markings."); see also id. at 914 (reflecting the absence of any agreement between the Navy and GE that would require the Navy to keep GE's technical data confidential).  Based on its findings, the Navy concluded:  "[T]he manuals, although titled 'Navy Technical Manuals,' contain inextricable GE proprietary information that has been incorporated over many years.  This information cannot be released to non-GE Level IV Licensed offerors without GE authorization.  GE's numerous complaints were adamant that it does not authorize such release."  Id.  But cf. id. at 381, 405 (reflecting, in a contract the Navy awarded to Chromalloy Gas Turbine LLC in May 2018 for the repair and refurbishment of LM2500 hot section components, that the Navy would provide its technical manuals after contract award), 470-71 (reflecting that the Navy disclosed its technical manuals to Chromalloy Gas Turbine LLC in July 2018), 1066 (indicating, in an April 29, 2019 letter from the Navy to Chromalloy Gas Turbine LLC, that the Navy disclosed its technical manuals in conjunction with their May 2018 contract, that the Navy had determined that the manuals should not have been disclosed because they contain GE proprietary information, and that the Navy requested that the manuals be destroyed).

---

[5]  The administrative record also includes a portion of a "Procurement Specification for Propulsion Gas Turbine Module," dated December 30, 1970, that was prepared for the DD-963 class ship program.  AR 719-89.  Section 3.4.3 of the specification addresses what must be included in new, existing, and commercial technical manuals, id. at 760, and section 4.10.3 of the specification addresses the validation and verification of new technical manuals and updates to technical manuals, id. at 788.  Neither section addresses rights in the technical data, and the specification itself—which presumably would have been part of a procurement contract— includes no clauses addressing rights in technical data.  See generally id. at 719-89.

**I.  The Navy's Evaluation of Chromalloy's Proposal, Discussions, and Amendment 6**

As represented to Mr. Young, the Navy's evaluation of proposals remained ongoing. Upon evaluating Chromalloy's proposal, the Navy found the information provided by Chromalloy to be deficient.  Id. at 1725.  Because of that finding, and in light of a "significant shortfall of . . . LM2500 PBT engines to support the [Navy's] modernization schedule," the Navy determined that discussions with Chromalloy were necessary.  Id.  Accordingly, on February 19, 2019, the Navy sent a discussion letter to Chromalloy indicating that it had rated Chromalloy's technical proposal as unacceptable and identifying three deficiencies.  Id. at 291-93.  Two of the deficiencies related to Chromalloy's access to GE-certified spare parts:

> Deficiency:  The proposal provides insufficient evidence that Chromalloy is able to source exclusively OEM certified parts per the requirement in the Solicitation.  Chromalloy states [it] can purchase directly from GE or "an alternate, traced source."  The above [underlined language] does not meet Solicitation requirement.  There is no allowance for alternate.

> Deficiency:[]  On Page 6 of the technical proposal, Chromalloy states it will "ensure the supplier-part is the same or equivalent to the GE part-number.  If the Customer wants only genuine GE-certified LM2500 parts "born" through GE, then we restrict our purchases accordingly".  This does not equate to exclusively GE-certified parts, per the requirements of the Solicitation.

Id. at 291-92.  The third deficiency related to the special tooling requirement:

> The Solicitation provided a list of 23 different types of special tooling which an Offeror must demonstrate it owns or has access to in order to meet the technical requirement.  Chromalloy stated it owned or had access to 15 of the 23 different types of special tooling and owned or had access to the remaining 8 different types of special tooling which they considered to be equivalent.  . . .

> . . . .

> Deficiency:  The proposal does not provide Objective Quality Evidence (OQE) that the proposed alternate tools are technically equivalent.  The Solicitation did not allow for equivalent special tooling and the use of any tooling other than listed does not meet the requirements per the Solicitation.  Therefore, Chromalloy did not meet the criteria required for this element.

Id. at 291.

In addition to identifying the three proposal deficiencies, the Navy advised Chromalloy that concurrent with its discussion letter, it was issuing Amendment 6 to the solicitation, which included new requirements:

Please note that Amendment 0006 states that Navy manuals will only be provided to awardees able to demonstrate compliance with Section L.3.2.a [-] L.3.2.f of the Solicitation. These new, additional requirements are under Factor 1, Technical. You must address all elements of Factor 1 . . . , including the new requirements and the deficiencies identified . . . , in order to be rated Acceptable for Factor 1 and eligible for award.

Id.; see also id. at 283-90 (Amendment 6), 916-17 (indicating that the Navy, "utilizing legal counsel, technical expertise, and contracting," decided to amend the solicitation to require offerors to have independent access to GE technical manuals and service bulletins), 920 (indicating that when the Navy became aware of the contents of its technical manuals "in that December time frame," it decided it could not provide those manuals to contractors). Specifically, the Navy revised section L.3.2 of the solicitation as follows:

Offerors must provide either a copy of a current GE Level IV License or, in the alternative, provide detailed information addressing the following requirements:

a.  Spare Parts Access:  Offerors shall demonstrate an ability to provide genuine OEM-certified LM2500 parts and assemblies as required during the overhaul and repair processes.  Non OEM parts will not be accepted.  Offerors must demonstrate through invoices or other proof of access to any and all parts required to completely overhaul an LM2500 engine.

b.  Special Tooling:  Offerors shall demonstrate [they] own[] or [have] access to all OEM produced special tools required to completely disassemble, overhaul, and reassemble the LM2500 engine.  The Special tooling that must be addressed [includes twenty-three items identified by "Special Tooling Number" and "Special Tooling Description"].  Substitution of non-OEM special tooling will not be accepted[.]

. . . .

c.  Testing:  Offerors shall demonstrate [they] possess[] an active Large Turbine Test Cell in accordance with Paragraph C.3.2 of the Statement of Work . . . .

d.  Quality:  Offerors shall provide a current ISO 9001 quality assurance program certification.

e.  Technical Documentation:  Navy manuals will only be provided to awardees able to demonstrate compliance with Section L.3.2.a - L.3.2[.]f of this Solicitation.  Offerors must have access to all relevant LM2500 OEM service manuals, updates to those manuals, and service bulletins concerning the LM2500 engine, periodically issued by the OEM.  In order to satisfy this requirement,

Offerors must provide evidence of access to the described OEM service-related information.

      f.  OEM Service Bulletins:  Offerors shall demonstrate [they have] access to service bulletins concerning the LM2500 engine, periodically issued by the OEM.  Navy Service Bulletins will not be provided upon award.

Id. at 288-89.  The Navy also revised the evaluation criteria set forth in the solicitation, indicating that to be rated technically acceptable, an offeror was required to:

      (1)  Possess a current GE Level IV License or;

      (2)  Provide all of the information required in Section L.3.2 and clearly demonstrate that it has the capability provide OEM-certified parts, [has] access to the special tooling identified in L.3.2.b, possess[es] a test cell in accordance with Section C.3.2, [has] a current ISO 9001 quality assurance program certification, and [has] access to current OEM technical documentation and service bulletins.

Id. at 289.

The Navy invited Chromalloy to submit a final proposal revision addressing the solicitation's new requirements and the identified proposal deficiencies by February 26, 2019.  Id. at 291-92.  Chromalloy and the other two offerors submitted final proposal revisions.  Id. at 138, 2213-19.

## J.  The Navy's Third Round of Correspondence With GE

One day before the Navy initiated discussions with Chromalloy, Ms. Widmann sent the following inquiry to Mr. McGuire:  "I am writing to inquire regarding the status of the subject solicitation[].  GE continues to feel strongly that a face-to-face meeting with the Navy is required to discuss the urgent Intellectual Property/Trade Secrets issues raised in our prior correspondence with your office and Navy operational personnel."  Id. at 476; accord id. at 475 (noting that GE's "primary concern" was "the protection of [its] Intellectual Property and [its] need to have a face to face discussion with the Navy on this subject").  Mr. McGuire responded on February 19, 2019, that the procurement was "in the evaluation phase" and therefore he could not comment, but that upon the completion of the procurement, he would be able to schedule a meeting.  Id. at 475.  Then, on March 11, 2019, he forwarded a copy of Amendment 6 to Ms. Widmann.  Id. at 474.

## K.  GAO Protest

In the meantime, on February 25, 2019—after receiving the discussion letter but one day before its final proposal revision was due—Chromalloy lodged a protest with the GAO to challenge the requirements added to the solicitation with Amendment 6, namely, the requirements related to technical documentation, service bulletins, and special tooling.  Id. at 1-8.  The parties provided extensive documentary evidence to the GAO in support of their positions.

See generally id. at 143-338, 345-440, 447-67, 470-72, 474-789, 1039-68, 1077-180.  The GAO held a hearing on Chromalloy's protest on April 24, 2019, id. at 790-1031, during which it heard testimony from GE Marine Division's product development manager, David Hartshorne, id. at 797; the Navy's contracting officer for the procurement, Kevin Hann, id. at 879-80; and the lead engineer for the Navy's LM2500 program, Mr. Driscoll, id. at 925.[6]  The GAO issued its decision on June 3, 2019.  Id. at 1181-87.  With respect to the Chromalloy's challenge of the technical documentation and service bulletins requirements, the GAO concluded:

> Based on our review of the record, including the testimony provided during the GAO hearing, . . . we reject Chromalloy's assertion that the Navy must provide [the LM2500 manuals and updates] to Chromalloy.  As discussed above, the record is consistent with the Navy's assertions that the information was developed by GE at its own expense, and that GE has consistently identified the information as proprietary.  Finally, other than referring to the Navy's apparent prior release of GE technical data, Chromalloy has presented no support for its assertion that the Navy has acquired unlimited rights to that data.  On this record, the agency has reasonably supported its assertion that release of the information to Chromalloy would raise serious concerns regarding violation of the Trade Secrets Act, and the agency's prior release of such information does not render the current solicitation provision improper.

Id. at 1185; see also id. at 1182 (relying solely on Mr. Hartshorne's hearing testimony for its finding that "[t]he record establishes that . . . the development and manufacture of [the LM2500] generators was funded entirely by GE").  And, with respect to Chromalloy's challenge of the special tooling requirement, the GAO concluded:

> Based on our review of the record, including the testimony provided during the GAO hearing, we reject Chromalloy's assertion that the requirement for an offeror to demonstrate access to a limited number of OEM tools overstates the agency's minimum needs.  In this regard, the record establishes that the requirements at issue relate to national defense and human safety and reasonably supports the agency's determinations regarding the necessity of the tools to successfully perform the contract requirements.  Chromalloy's general assertion that its tools are "equivalent" fails to meaningfully refute the agency's representations in this regard.

Id. at 1186.  Accordingly, the GAO denied Chromalloy's protest.  Id. at 1181, 1187.

---

[6]  The GAO hearing officer advised the witnesses that although they would not be sworn in to testify, they were subject to the provisions of 18 U.S.C. § 1001, which allows for the imposition of criminal penalties for knowingly making false statements to the federal government.  AR 796, 878, 924.

## L.  Evaluation of Proposals and Contract Awards

One week after the GAO issued its decision, the Navy evaluated the three submitted proposals, concluding that the two offerors with GE Level IV licenses were technically acceptable and that Chromalloy was not technically acceptable.  Id. at 2213-19.  The Navy found Chromalloy's proposal to be deficient with respect to the following requirements:  spare parts access, special tooling, technical documentation, and service bulletins.  Id. at 2215.  With respect to the spare parts access requirement, the Navy indicated that Chromalloy had provided nine recent purchase orders to establish its access to GE-certified spare parts, but that those purchase orders were insufficient to satisfy the requirement.  Id. at 2215-16.  With respect to the special tooling requirement, the Navy indicated that Chromalloy had provided documentation to support its claim that eight of its proposed special tools were equivalent to those manufactured by GE, but observed that no equivalent special tooling was permitted.  Id.  Finally, the Navy noted that Chromalloy did not provide any information regarding the technical documentation and service bulletin requirements, and therefore was deficient in both.  Id. at 2217.

In light of its technical evaluations, the Navy decided to award contracts to the two offerors with GE Level IV licenses and not to Chromalloy.  Id. at 2220, 2224.  Defendant represents that a task order has been issued under each awarded contract.  See Def.'s Cross-Mot. J. Administrative R. 46.

## M.  This Protest

Chromalloy filed the instant protest on July 5, 2019, asserting three claims for relief in its complaint.  In Count I, Chromalloy contends that the requirement that offerors have independent access to GE technical manuals and service bulletins unduly restricts competition in violation of the Competition in Contracting Act of 1984 ("CICA").  In Count II, Chromalloy contends that the requirement that offerors use only GE-manufactured special tools violates the CICA because it unduly restricts competition and is unnecessary to meet the Navy's minimum needs.  In Count III, Chromalloy contends that the special tooling requirement is contrary to standard commercial practice and therefore violates the Federal Acquisition Streamlining Act of 1994 ("FASA").  Chromalloy requests that the court declare the technical data and special tooling requirements to be unlawful, and either (1) direct the Navy to award it a contract or (2) enjoin the Navy from proceeding with the contract awards under the solicitation and direct the Navy to revise the solicitation to be consistent with the law.

Shortly after Chromalloy filed its protest, the court granted GE's motion to intervene.  Then, during the initial scheduling conference, the parties indicated that Chromalloy might seek to supplement the administrative record, and that such a motion should be resolved before the parties briefed the merits of the protest.  Thus, as proposed by the parties, the court adopted an expedited schedule for considering supplementation of the administrative record.  In an August 20, 2019 Opinion and Order, the court denied Chromalloy's supplementation motion and directed the parties to propose a schedule for briefing the merits of Chromalloy's protest.  Chromalloy San Diego Corp. v. United States, 144 Fed. Cl. 585 (2019).  The court adopted the parties' proposed schedule.

Before the commencement of briefing, Chromalloy moved for leave to file a supplemental complaint pursuant to Rule 15(d) of the Rules of the United States Court of Federal Claims ("RCFC") to add a claim regarding the Navy's evaluation of its final proposal revision with respect to the spare parts requirement. It explained that the purpose of its motion was to preserve its rights and counter any future argument that it did not timely challenge the Navy's evaluation. It further asserted that the court would not be required to rule on its new claim because it was not part of the administrative record. Defendant did not oppose Chromalloy's motion. Nevertheless, the court convened a status conference on September 16, 2019, to obtain clarification from Chromalloy regarding the rationale for, and necessity of, supplementation.

During the status conference, Chromalloy and defendant agreed that resolution of the new claim would be unnecessary regardless of how the court ruled on Chromalloy's original claims. However, GE disagreed with the other parties, asserting that evidence related to the spare parts access issue would establish that Chromalloy lacked standing to protest. After the parties explained their positions, the court granted Chromalloy's motion. Then, in response to GE's request that defendant complete the administrative record with documents related to the new claim in the supplemental complaint, the court advised the parties to confer regarding what steps to take and that it would rule on any motions filed by the parties.

Chromalloy thereafter filed its supplemental complaint, setting forth a fourth claim for relief and supporting allegations. Specifically, Chromalloy alleges that it was advised on August 2, 2019, that the Navy realized that it had not provided Chromalloy with an unsuccessful offeror letter or an opportunity for debriefing; that the Navy provided the letter to Chromalloy on August 5, 2019; that the letter reflected that the Navy found Chromalloy's final proposal revision to be unacceptable with respect to the requirements related to technical documentation, service bulletins, special tools, and spare parts access; that the Navy provided a written debriefing to Chromalloy on August 7, 2019, in which it indicated that the nine recent purchase orders submitted by Chromalloy to establish its access to spare parts were insufficient to meet the requirement; and that the Navy answered some of Chromalloy's follow-up questions on August 14, 2019. In conjunction with these allegations, Chromalloy contends, in Count IV of its supplemental complaint, that the Navy's interpretation of the spare parts access requirement was unreasonable and, therefore, that its evaluation of the information provided by Chromalloy to satisfy the requirement was unreasonable.

In accordance with the schedule proposed by the parties, Chromalloy filed its motion for judgment on the administrative record, defendant and GE filed their responses and cross-motions for judgment on the administrative record, Chromalloy filed its reply and response, and defendant and GE filed their replies. On the same date that it filed its reply, defendant filed an administrative record related to the new allegations and claim set forth in Chromalloy's supplemental complaint ("second administrative record"). Two days later, Chromalloy moved to strike the second administrative record or, in the alterative, to allow for supplementation of the administrative record and an opportunity for further briefing. Defendant and GE oppose Chromalloy's motion.

The parties have fully briefed their motions and the court heard argument on November 5, 2019.  Having considered the parties' submissions and oral argument, the court is prepared to rule.

## II. DISCUSSION

In ruling on motions for judgment on the administrative record pursuant to RCFC 52.1(c), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, 404 F.3d at 1356.

### A. The Administrative Record

As a threshold matter, the court is confronted with two issues regarding the contents of the administrative record:  (1) whether certain documents from the GAO's proceedings should be included in the original administrative record and (2) whether the documents in the second administrative record are properly before the court and, if so, whether the second administrative record is complete.  The court addresses each issue in turn.

### 1. The Record of the GAO's Proceedings

In the originally filed administrative record, defendant included what appears to be the entire record of Chromalloy's second protest at the GAO, including (1) the Navy's report and related documents; (2) certain other documents that were available to, or considered by, the Navy during the competition (e.g., cover pages of GE and Navy technical manuals, contracts between the Navy and GE for the acquisition of LM2500 engines); (3) the transcript of the evidentiary hearing convened by the GAO; (4) posthearing briefs; and (5) the GAO's decision.  By statute, the administrative record in the United States Court of Federal Claims must include certain documents from a predecessor GAO protest, 31 U.S.C. § 3556 (2018), including the contracting agency's "complete report (including all relevant documents) on the protested procurement," id. § 3553(b)(2), and "any decision or recommendation of the Comptroller General," id. § 3556. Moreover, paragraph 22(u) of RCFC Appendix C indicates that the "core documents relevant to a protest case may include," among other material, "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement."  Thus, it was not improper for defendant to include the record of the GAO protest in the original administrative record.  Indeed, neither Chromalloy nor GE objected to the inclusion of this material in the administrative record, and all three parties relied on this material in support of their arguments.

However, the court is mindful that "the focal point for judicial review should be the administrative record already in existence," Camp v. Pitts, 411 U.S. 138, 142 (1973), in other words, the materials developed and considered by the agency in making the decision subject to judicial review, see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971),

overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997).  That being said, in the context of a bid protest, consideration of postdecisional material is often necessary:

> A court cannot evaluate a charge that the contracting officer failed to consider required submitted information without learning from the protestor what was omitted.  A court cannot give due regard to the interests of national defense and national security without accepting a declaration or affidavit from a responsible official.  A court cannot examine agency actions that are assailed as a conflict of interest, bias, or other extra-legal activity without considering evidence that was not before the agency when the administrative decision was made.  Nor can a court evaluate the parties' factual showings regarding the three equitable findings for injunctive relief without accepting post-final-agency-action evidentiary submissions.

Totolo/King, a Joint Venture v. United States, 87 Fed. Cl. 680, 693 (2009) (citation omitted), appeal dismissed per curiam, 431 F. App'x 895 (unpublished decision); see Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 209 (2011) (remarking that "the Court may rely on declarations of contracting officers for purposes of determining whether the agency's action at issue in the bid protest was arbitrary and capricious," such as when "the contracting officer is not required to take action or document or explain a decision, [and] the court needs to know what information the contracting officer considered and 'on what basis he made the determination'").

In contrast, other postdecisional material—as relevant here, contracting officer statements provided to, and testimony taken by, the GAO—may include information that constitutes an after-the-fact rationalization for a procuring agency's decision.  See Holloway & Co. v. United States, 87 Fed. Cl. 381, 392 (2009); see also Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 103, 112 (2011) (disallowing reference to a GAO hearing transcript because the transcript included "post-award statements by the [contracting officer] explaining how the [contracting officer] arrived at her award decision").  Because the court must critically assess a procuring agency's after-the-fact rationalizations and discount or reject them as appropriate, see Citizens to Preserve Overton Park, 401 U.S. at 420; Vanguard Recovery Assistance v. United States, 99 Fed. Cl. 81, 102 (2011), it must exercise caution when assessing material that could be construed in such a manner, see Halloway & Co., 87 Fed. Cl. at 392; see also Cubic Applications, 37 Fed. Cl. at 343-44 (noting that the court had "a choice about the degree of relevance to assign to" postdecisional documents included in an administrative record).

In accordance with these considerations, the court included in its recitation of the facts relevant to this protest information derived from (1) certain documents offered by the parties during the GAO protest that were available to, or considered by, the Navy during the competition, and (2) the testimony elicited during the GAO hearing.  With respect to the GAO hearing, the court was careful to refer to information that reflected what actions the Navy took to determine its requirements for the procurement, and not to information that indicated the reasoning behind those actions.  Cf. Totolo/King, 87 Fed. Cl. at 693 n.7 ("A discrete difference exists between adding evidence to the record to aid in the reexamination of the contracting

officer's decision and submitting an evidentiary filing that points out to the court whether the contracting officer did or did not do something.").

## 2. The Second Administrative Record

The second evidence-related issue is whether the documents in the second administrative record are properly before the court. As noted above, Chromalloy supplemented its complaint to add a claim related to the Navy's evaluation of its final proposal revision. Because Chromalloy's protest had been limited to challenging three solicitation provisions, the then-existing administrative record did not include Chromalloy's final proposal revision or any evidence postdating Chromalloy's second GAO protest. However, GE relied on the not-yet-filed evidence in its cross-motion for judgment on the administrative record to support its contention, discussed below, that Chromalloy lacks standing to protest. Chromalloy observed in its reply and response that the evidence upon which GE relied was not in the administrative record and did not itself rely on that evidence in countering GE's standing argument. Thereafter, on the same day that it filed its reply, defendant filed the second administrative record.

Two days later, Chromalloy moved to strike the second administrative record or, in the alternative, to supplement the administrative record and allow it an opportunity to respond to GE's arguments that are premised on the newly filed evidence. Defendant and GE oppose Chromalloy's motion.

The court need not discuss the parties' arguments in great detail since it must conclude that the contents of the second administrative record are properly before it. Chromalloy filed a supplemental complaint in which it asserted a new claim that could not be resolved by reference to the then-existing administrative record. Pursuant to RCFC 52.1, "[w]hen proceedings before an agency are relevant to a decision in a case, the administrative record of those proceedings must be certified by the agency and filed with the court." And, pursuant to paragraph 23 of RCFC Appendix C, "[b]ecause a protest case cannot be efficiently processed until production of the administrative record, the court expects the United States to produce the core documents and the remainder of the administrative record as promptly as circumstances will permit." The new claim asserted by Chromalloy in its supplemental complaint is effectively a new protest. Thus, defendant was both entitled and required to file the second administrative record.[7]

Moreover, Chromalloy is not prejudiced by the filing of the second administrative record. First, defendant only filed the second administrative record because Chromalloy filed a supplemental complaint. Second, the court did not need to rely on the second administrative record to resolve GE's standing argument (a reason that renders moot Chromalloy's request for supplementation and further briefing). Consequently, the court denies Chromalloy's motion to strike or, in the alternative, for supplementation and further briefing.

---

[7] Although defendant arguably could have filed the second administrative record earlier than it did, the delay does not negate the propriety of the filing.

## B. Standing

Having determined the proper contours of the administrative record, the court must address GE's threshold contention that Chromalloy lacks standing to protest.[8]  Specifically, GE contends that because Chromalloy could not have been a successful offeror due to its inability to satisfy the solicitation's spare parts access requirement, it lacks standing to challenge the terms of the solicitation.

### 1. Legal Standard

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).  In bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

To have standing under 28 U.S.C. § 1491(b)(1), a protestor must first demonstrate that it is an "interested party."  Interested parties are those "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)).  Therefore, to be considered an interested party, a protestor must establish that it (1) is an actual or prospective offeror and (2) possesses a direct economic interest in the award of (or failure to award) the contract. CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (noting that the burden of establishing standing is on "[t]he party invoking federal jurisdiction").  "Generally, to prove the existence of a direct economic interest, a [protestor] must show that it had a 'substantial chance' of winning the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).  "An exception to that standard is when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid.  In that circumstance, the protestor can establish standing by demonstrating that it suffered a 'non-trivial competitive injury which can be redressed by judicial relief.'" Id. (quoting Weeks Marine, 575 F.3d at 1361).

Section 1491(b)(1)'s standing requirement also requires a protestor to "show that it was prejudiced by a significant error in the procurement process."[9]  Labatt Food Serv., Inc. v. United

---

[8]  Defendant does not join GE's standing argument.

[9]  A protestor must also demonstrate prejudice to succeed on the merits of its protest. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review.  See L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244

States, 577 F.3d 1375, 1378 (Fed. Cir. 2009); accord Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing."). The existence of "[p]rejudice is a fact question." CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018).

### 2. Chromalloy Has Standing to Protest

GE's standing argument focuses on the second prong of the interested party inquiry: whether Chromalloy possesses a direct economic interest in the procurement.[10] GE contends that because Chromalloy submitted a proposal that the Navy evaluated, the "substantial chance" test applies, but that even if the "non-trivial competitive injury" test applied, Chromalloy would need to establish that it was eligible to be awarded the contract—and it cannot do so.

As GE observes, even under the more lenient "non-trivial competitive injury" standard, a protestor "must at least be qualified to compete for the contract it seeks." CliniComp Int'l, 904 F.3d at 1360. GE asserts that Chromalloy is ineligible to be awarded the contract because the Navy has twice found Chromalloy unable to satisfy the solicitation's spare parts access requirement. Indeed, the administrative record reflects that the Navy identified two disqualifying deficiencies in Chromalloy's first proposal related to the spare parts access requirement—Chromalloy's suggestions of obtaining parts from "an alternate, traced source" and using parts that may not be "OEM-certified"—and that the Navy found Chromalloy's submission of nine purchase orders with its final proposal revision insufficient to prove its access to the required spare parts. Chromalloy responds that the Navy's evaluation of its proposals is irrelevant because for the purpose of establishing standing, it is sufficient for it to demonstrate prior successful performance of the solicited services, and it has made such a showing.

Chromalloy misconstrues the legal standard. It is not enough that a protestor establish that it can perform the work generally described in the solicitation. Rather, a protestor must demonstrate that it can satisfy the requirements set forth in the solicitation. See id. (stating that the protestor "lacks standing because it failed to demonstrate an ability to perform specific requirements that are set forth in the" solicitation). Here, as applied to Chromalloy, those requirements included demonstrating an "ability to provide genuine OEM-certified LM2500 parts and assemblies . . . through invoices or other proof of access . . . ." AR 288. The Navy has twice determined that Chromalloy has not satisfied this requirement. However, this fact is not fatal to Chromalloy's standing to protest.

---

(2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings).").

[10] GE presents its argument as a challenge to Chromalloy's status as an interested party rather than as a challenge to Chromalloy's ability to establish prejudice. GE separately advances a prejudice argument as to the merits of Chromalloy's protest.

The factual circumstances of this protest are unique.  Upon evaluating Chromalloy's first proposal, the Navy advised Chromalloy that its attempt to satisfy the spare parts access requirement was deficient and, at the same time, amended several of the solicitation's requirements.  Because Chromalloy believed that three of the newly amended requirements (related to the technical manuals, service bulletins, and special tooling) were improper, it lodged a protest with the GAO before the deadline for submitting final proposal revisions.  It then submitted a final proposal revision in which it attempted to satisfy the newly revised spare parts access requirement by submitting what it believed was proof of its access to the required spare parts.  Thus, at the time it lodged its protest at the GAO and submitted its final proposal revision to the Navy, it believed that it could satisfy the (legally permissible) spare parts access requirement.  However, the Navy ultimately found otherwise, determining that the purchase orders submitted by Chromalloy were insufficient to establish Chromalloy's access to the necessary spare parts.  That determination could be challenged by Chromalloy in the context of a postaward bid protest, so long as it succeeds in its preaward challenge to the technical manual, service bulletin, and special tooling requirements.[11]  And, in fact, Chromalloy has supplemented its complaint with a claim that the Navy improperly evaluated its final proposal revision with respect to the spare parts access requirement.  In light of Chromalloy's demonstrated intent to challenge the Navy's evaluation of its proposal, it would be inappropriate for the court to use the Navy's evaluation as evidence that Chromalloy is not qualified to compete for the overhaul services contract.

Because Chromalloy has not been deemed ineligible to be awarded the overhaul services contract on a requirement it is not challenging—either in its preaward protest of the technical manual, service bulletin, and special tooling requirements or its postaward protest of the Navy's evaluation of its proposal with respect to the spare parts access requirement—it is qualified to compete for the contract.  Moreover, because Chromalloy's claim that the Navy improperly evaluated its final proposal revision would be moot regardless of how the court ruled on the remaining claims (if Chromalloy prevails, the Navy would need to, at a minimum, reevaluate Chromalloy's proposal based on revised technical criteria, and if defendant prevails, Chromalloy would be eliminated from the competition), this protest is best characterized as a preaward protest of the terms of the solicitation.  Thus, to establish a direct economic interest, Chromalloy need only demonstrate a "non-trivial competitive injury," which, by alleging that it was eligible to be awarded a contract had the Navy issued a solicitation that complied with the pertinent statutes and regulations, it did.[12]  In short, Chromalloy has established standing to protest.

---

[11]  Of course, if Chromalloy prevails in its challenges to the solicitation requirements, the Navy's evaluation of Chromalloy's final proposal revision would be irrelevant because the final proposal revision was submitted in response to an invalid solicitation.

[12]  By demonstrating a direct economic interest in the procurement, Chromalloy has also established the prejudice element of the standing inquiry.  See CliniComp Int'l, 904 F.3d at 1358 ("Although the inquiries are similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest.").

### C. Bid Protest Legal Standard

Having determined that Chromalloy has standing to protest the terms of the solicitation, the court turns to the merits of Chromalloy's protest.  The court reviews challenged agency conduct pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4) (2018).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010) (providing that a protestor has the "burden of showing that the agency's decision . . . is so plainly unjustified as to lack a rational basis"); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").  Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  "The court is not empowered to substitute its judgment for that of the agency."  Citizens to Preserve Overton Park, 401 U.S. at 416.

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it."  Data Gen., 78 F.3d at 1562; accord Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").

### D. Access to GE Technical Manuals and Service Bulletins

Chromalloy first challenges the requirement that offerors without a GE Level IV license demonstrate that they have independent access to GE technical manuals and service bulletins.  In its motion for judgment on the administrative record, Chromalloy advances two arguments.  First, it contends that the Navy improperly required offerors to have independent access to the GE material without first determining whether independent access was necessary to satisfy its

minimum needs.  Second, it contends that the Navy used noncompetitive procedures without preparing the required justification.  The court addresses each contention in turn.

## 1. Chromalloy's Minimum Needs Argument Lacks Merit

Under the CICA, an agency "shall obtain full and open competition through the use of competitive procedures" when procuring goods or services.  10 U.S.C. § 2304(a)(1)(A) (2018).  In obtaining full and open competition, an agency must, prior to issuing a solicitation, identify its needs, id. § 2305(a)(1)(A)(i), "using market research," FAR 11.002(a)(1).  Additionally, the agency may include in the solicitation "restrictive provisions or conditions only to the extent necessary to satisfy the needs of the agency or as authorized by law."  10 U.S.C. § 2305(a)(1)(B)(ii).  Although an agency is "not required to synthesize its thinking and its market research into a prelitigation written explanation of the rationale for each of the solicitation requirements," its rationale must be "apparent from, and supported by, the agency record."  Savantage, 595 F.3d at 1287.  When a protest concerns an agency's determination of its minimum needs, the "agency's preferences are entitled to great weight."  Id. at 1286.

Chromalloy argues that the Navy's determination that the overhaul of LM2500 PBT Gas Generators needs to be performed by a contractor possessing a GE Level IV license or having independent access to GE technical manuals and service bulletins was plainly unjustified because such a requirement was not necessary to meet the Navy's minimum needs.  Moreover, it contends that the Navy could not have determined its minimum needs without a meaningful assessment of its rights in the technical data supplied by GE because its ability to disclose that data depended on the rights it held.

Chromalloy's contentions are premised on the assumption that the Navy cannot require a contractor to have independent access to GE technical manuals and service bulletins if the Navy possesses the necessary technical data rights such that it could provide its manuals to its contractors—in other words, if the Navy possesses the necessary rights to the technical data, then it cannot require contractors to also have the necessary rights.  The court need not opine on the validity of this assumption because Chromalloy cannot satisfy its burden on other grounds.

Assuming that the Navy could not require contractors to have independent access to technical data that it had the right to disclose to contractors, it follows that the Navy must perform an assessment of its rights in any technical data necessary for the performance of a contract when identifying its needs.[13]  Cf. Am. Diesel Eng'g Co., B-245534, 92-1 CPD ¶ 79 (Comp. Gen. Jan. 16, 1992) (reflecting that the procuring agency attempted to ascertain its rights to technical data prior to the deadline for the submission of proposals); Applied Devices Corp., B-187902, 77-1 CPD ¶ 362 (Comp. Gen. May 24, 1977) (reflecting that the procuring agency determined that the available technical data was incomplete and lacked sufficient detail to permit

---

[13]  The fact that the Navy faced heavy pressure from GE to remove the provision in the solicitation allowing an offeror without a GE Level IV license to be awarded a contract and consequently receive access to the Navy's technical manuals is not relevant to the court's inquiry.  The Navy was obligated to investigate its right to use the technical data supplied by GE regardless of GE's position on the matter.

a competitive procurement).  Thus, the questions before the court are (1) whether the Navy performed such an assessment and (2) whether any such assessment was sufficient.  The answer to the first question is straightforward:  the evidence in the administrative record reflects that the Navy performed an assessment of the rights it held in the technical data supplied by GE prior to issuing Amendment 6 to the solicitation and directing the submission of final proposal revisions.

With respect to the second question, the documentary evidence in the administrative record reflects that the Navy sought information from GE regarding the GE Level IV licensure requirement in October 2018 during the pendency of Chromalloy's first GAO protest; corresponded with GE in December 2018 and January 2019 after GE became aware of the Navy's amendment of the solicitation to allow for contract awards to be made to offerors without a GE Level IV license; and, prior to issuing Amendment 6 to the solicitation, considered GE's contentions that providing technical manuals to contractors without a GE Level IV license would violate the Trade Secrets Act and GE's intellectual property rights.  In addition, the testimony elicited during the GAO hearing reflects that prior to issuing Amendment 6 to the solicitation, the Navy identified five contracts through which it purchased LM2500 engines and determined that none of those contracts required GE to provide the Navy with technical manuals or service bulletins;[14] reviewed the technical material supplied by GE and found that it was all marked as GE proprietary information; determined that notwithstanding the permissive distribution statement on its own manuals, its longstanding practice was to restrict the distribution of its manuals because they included proprietary information; and ascertained that since it began outsourcing the repair and overhaul of LM2500 engines five to seven years ago, it had disclosed its manuals only to contractors holding GE Level IV licenses.[15]  The testimony further reflects that attorneys for the Navy were involved in the investigation.

Chromalloy argues that the Navy's investigation was inadequate.  It asserts that the Navy should have reviewed the standard technical data rights clauses that were in effect when it first purchased the LM2500 engine from GE, which would have prompted the Navy to research the source of funding for the development of the LM2500 engine—a key factor in determining the Navy's rights.  See 10 U.S.C. § 2320(a)(2) (indicating that the government's rights in technical data associated with an item or process depends upon whether the item or process was developed using federal funds); accord DFARS 227.7102-4(b) (indicating which clauses should be used in commercial item contracts when the government funds a portion of the development of a commercial item, and reflecting that one provision governs technical data related to the government-funded portion and a separate provision governs technical data related to the privately funded portion); DFARS 252.227-7013(b) (indicating that, in general, the government has "unlimited rights" in technical data when there is exclusive federal funding, "government purpose rights" in technical data when there is mixed federal and private funding, and "limited

---

[14]  During oral argument, GE asserted that these five contracts were all that the Navy could locate.  This assertion is an inference drawn by counsel; the administrative record merely indicates that the Navy located five contracts from within the last twenty years.

[15]  It was not until after its investigation and Chromalloy lodging its second protest at the GAO that the Navy discovered that it had disclosed its technical manuals to a contractor without a GE Level IV license.

rights" when there is exclusive private funding). Moreover, Chromalloy contends, had the Navy performed such research, it would have discovered publicly available material confirming that the government helped fund development of the LM2500 engine, which would confer upon the Navy rights sufficient to allow it to disclose its technical manuals to its contractors.[16]

The evidence in the administrative record reflects that the Navy undertook more than a de minimis investigation into the rights it held in the technical data included in the material supplied by GE. It researched its prior contracts for the purchase of the LM2500 engines, ascertained that GE had marked its technical material as proprietary, determined that its own technical manuals incorporated information from GE's technical documents, and confirmed its longstanding practice of restricting the disclosure of its technical manuals because they included proprietary information. Undoubtedly, the Navy could have done more. For example, the Navy is certainly aware that its ability to disclose technical data is governed by statute (10 U.S.C. §§ 2320-2322) and regulation (DFARS subpart 227.71 and sections 252.227-7013 to -7037), which indicate that one of the key considerations is whether the government funded the development of the LM2500 engine or the overhaul process in whole or in part. However, contrary to defendant's contention during oral argument, there is no evidence in the administrative record that the Navy researched the funding issue; rather, it appears to have solely relied upon GE's representations that GE developed the LM2500 engine exclusively at its own expense. Be that as it may, the court's task is not to determine whether the Navy took all possible investigatory steps to ascertain its rights in the GE technical data. Rather, given the discretion accorded government officials conducting a procurement, the court's focus is on whether the Navy's investigation was reasonable. Based on the evidence in administrative record, it was.

Because the Navy investigated its rights in the technical data supplied by GE and because that investigation was reasonable, it was justified in using the results of that investigation as a basis to require offerors without a GE Level IV license to demonstrate independent access to GE technical manuals and service bulletins.[17] In other words, the Navy's determination of its needs (a contractor with its own access to GE technical data) had a rational basis.

---

[16] Relatedly, Chromalloy, relying on FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009), contends that the Navy's policy—as reflected in its technical manual distribution statements and the Navy's actual disclosure of its technical manuals to Chromalloy Gas Turbine LLC in July 2018—was to permit distribution of its manuals to government agencies and their contractors, and that it could not change that policy without documenting a good reason for the change. Further, Chromalloy contended during oral argument that the Navy had been providing its technical manuals to "non-OEM" contractors for over two decades. However, the evidence in the administrative record does not support Chromalloy's contentions. Rather, it reflects that the Navy's policy was to restrict the disclosure of its technical manuals due to the inclusion of proprietary information and that a single disclosure was made in error.

[17] Moreover, to the extent that GE provided technical data to the Navy pursuant to a contract (something that is not established by the evidence in the administrative record), even if the Navy ascertained that it possessed some rights in that data, the fact that GE marked the material it supplied to the Navy as proprietary means that the Navy would not have been able to disclose information from that material without either challenging GE's assertion that the data

## 2. Proper Justification

Chromalloy's second challenge to the requirement that offerors demonstrate independent access to GE technical manuals and service bulletins is that the requirement is a noncompetitive procedure and the Navy did not prepare the required justification for that procedure. As previously noted, agencies "shall obtain full and open competition through the use of competitive procedures" when procuring goods or services. 10 U.S.C. § 2304(a)(1)(A). Competitive procedures are—circularly—those "procedures under which the head of an agency enters into a contract pursuant to full and open competition." Id. § 2302(2); see also id. § 2304(a)(2) (indicating that competitive procedures include soliciting sealed bids and requesting competitive proposals). Noncompetitive procedures may only be used in limited circumstances, id. § 2304(c), including, as relevant here, when the services to be acquired are available "only from a limited number of responsible sources," id. § 2304(c)(1), such as when the procuring agency has "limited rights in data," FAR 6.302-1(b)(2). An agency may not use noncompetitive procedures unless "the contracting officer for the contract justifies the use of such procedures in writing and certifies the accuracy and completeness of the justification[.]" 10 U.S.C. § 2304(f)(1)(A); see also id. § 2304(f)(1)(B)-(C) (describing additional procedural requirements: approval of the justification and publication of notice). When the reason for using noncompetitive procedures is the existence of limited data rights, the justification should include an "[e]xplanation of why technical data packages . . . suitable for full and open competition have not been developed or are not available." FAR 6.303-2(b).

### a. Chromalloy Has Not Waived Its Proper Justification Argument

At the outset, the court considers defendant's contention that Chromalloy waived its proper justification argument. Under Blue & Gold Fleet, L.P. v. United States, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection in a bid protest action in the Court of Federal Claims." 492 F.3d 1308, 1313 (Fed. Cir. 2007). One of the purposes of the waiver rule is to ensure fairness in the procurement process:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

Id. at 1314; accord DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1343 (Fed. Cir. 2012) ("[I]f there is a patent, i.e., clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit."). Defendant asserts that Chromalloy did not raise its proper justification

---

was proprietary or obtaining GE's permission. See 10 U.S.C. § 2321; DFARS 227.7102-2; DFARS 227.7102-3.

argument prior to the deadline for submitting final proposal revisions, contending that Chromalloy did not pursue the argument at the GAO or in its complaint in this court, but instead raised it for the first time in its motion for judgment on the administrative record.  Therefore, defendant argues, Chromalloy has waived the argument.

In response, Chromalloy contends that it did address the Navy's use of noncompetitive procedures in its GAO protest and that in any event, it timely objected to the independent access requirement at the GAO and diligently pursued that protest.  It also argues that the purpose of the Blue & Gold Fleet waiver rule would not be thwarted by the court considering Chromalloy's proper justification argument because the two other offerors' ability to receive a contract would not be affected.

Defendant's characterization of Chromalloy's GAO protest is correct.  Although Chromalloy described some background principles from the CICA—the requirement for full and open competition and prohibition on restricting competition except in certain, specified circumstances—the thrust of its objection to the independent access requirement was that the requirement unduly restricted competition by overstating the Navy's needs.  Chromalloy did not argue that the independent access requirement amounted to a noncompetitive procedure such that the Navy was required to, but did not, prepare a justification.[18]

However, Chromalloy is correct that the purpose of the waiver rule is not implicated in this protest.  Chromalloy did not wait to challenge the independent access requirement until after proposals were submitted and then upon learning that it was an unsuccessful offeror, ambush the Navy and the other offerors by objecting to a patent error in the solicitation.  Indeed, the Navy was fully aware that Chromalloy objected to any requirement that the Navy's contractors have access to GE's technical manuals and service bulletins.  Moreover, neither the Navy nor the other offerors would be prejudiced by Chromalloy pursuing a proper justification argument in this court:  the argument is closely related to Chromalloy's contention that the Navy unduly restricted competition, the parties have fully briefed the argument, and the court's consideration of the argument would not affect the other offerors' ability to receive an award (since they both hold GE Level IV licenses).  Accordingly, Chromalloy has not waived its proper justification argument.[19]

_____

[18]  Chromalloy merely suggested, without elaboration, that the Navy's purported limitation on competition may have created a de facto sole source procurement.  See AR 1 ("The Navy has included several unduly restrictive requirements in the Solicitation so as, at best, to limit competition and at worst to award a [de] facto sole source contract.").

[19]  Pursuant to RCFC 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  Because judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record," Bannum, 404 F.3d at 1356, and the parties fully briefed Chromalloy's proper justification argument, the court can address the argument.  Accord The Ravens Grp., Inc. v. United States, 78 Fed. Cl. 390, 400 (2007) ("[The protestor] first raised its 'duty to investigate' claim in its opposition and cross motion brief.  Strictly speaking, [the protestor] should have moved for leave to amend its complaint to include this and the other new arguments made in its opposition brief.  However, both the Government and [the

**b. Chromalloy's Proper Justification Argument Lacks Merit**

The underlying premise of Chromalloy's contention that the Navy was required to prepare a justification for the requirement that offerors demonstrate independent access to GE technical manuals and service bulletins is that the requirement is a noncompetitive procedure. Defendant and GE assert that the independent access requirement is a technical requirement and not a noncompetitive procedure. The recent decision in National Government Services, Inc. v. United States, 923 F.3d 977 (Fed Cir. 2019), is directly on point.

National Government Services concerned the procurement of Medicare claim processing services, which are performed via twelve regional contracts. Id. at 979. The procuring agency, the Centers for Medicare and Medicaid Services ("CMS"), decided to implement a policy to limit the amount of contract responsibility that any one contractor could win as a prime contractor ("workload caps") to address certain market-related concerns. Id. at 980. It began to incorporate the policy into each new solicitation to acquire Medicare claim processing services for a particular region. Id. One of the claim processors filed a preaward bid protest to challenge the inclusion of the policy in two of the solicitations. Id. at 981. The issue presented by the protest was whether CMS complied with the CICA and the FAR "when it attempted to address its concerns by developing a blanket policy applicable to all [Medicare claim processing] solicitations that effectively excludes offerors from competing, without documenting the need for such action in light of a particular contract or a particular offeror." Id. at 982.

In defending the incorporation of the policy in the solicitations, the government argued that "the workload caps are merely evaluation criteria, and 'solicitation terms that result in particular offerors being unable to win an award based upon their particular circumstances do not violate CICA's competition requirements, so long as the terms have a rational basis in light of the agency's needs.'" Id. at 985 (quoting the government's brief). The court agreed with "the unremarkable proposition that a solicitation requirement (such as a past experience requirement) is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement," but held that to the extent that the CMS policy was an evaluation factor, the workload caps set forth in the policy were "not requirements tailored to meet CMS's needs for a particular procurement. Id. at 986; accord id. ("[I]nstead of being tailored to the needs of a particular contract, the workload caps are uniform parameters applicable to all [Medicare claim processing] contracts."). In short, the exclusion of offerors was "not based on some capability or experience requirement, but [was] instead based on the agency's attempt to divvy up the . . . contracts in a way that ensures business continuity and helps maintain a competitive . . . market." Id.

Here, the requirement that offerors either possess a GE Level IV license or have independent access to GE technical manuals and service bulletins is a technical criterium tailored

---

defendant-intervenor] took the opportunity to respond to [the protestor's] new arguments in their reply briefs and did not move the Court to require [the protestor] to amend its complaint or to strike these allegations. RCFC 15(b) allows the Court to address issues not raised in the pleadings where they are tried by express or implied consent of the parties.").

to the Navy's needs in procuring LM2500 PBT Gas Generator overhaul services. There is no dispute that a contractor overhauling an LM2500 PBT Gas Generator must use the Navy's technical manuals and that the Navy's technical manuals incorporate proprietary information supplied by GE. Thus, an offeror's ability to perform the overhaul services that the Navy is seeking in the solicitation at issue depends, in part, on its access to GE technical data. In other words, an offeror must demonstrate its ability to independently access GE technical data to be deemed technically capable of performing the services being acquired by the Navy.

Because the independent access requirement is a technical capability requirement, the CICA and FAR provisions regarding noncompetitive procedures are inapplicable. Consequently, Chromalloy cannot prevail on its proper justification argument.

### 3. Summary

In sum, Chromalloy has not met its burden of proving that the Navy violated the CICA by requiring that offerors either possess a GE Level IV license or have independent access to GE technical manuals and service bulletins. This failure is fatal to Chromalloy's protest because Chromalloy concedes that it lacks the necessary license and independent access to GE's technical materials. Nevertheless, for the purpose of judicial economy, the court will address Chromalloy's challenge to the special tooling requirement.

### E.  Use of GE-Manufactured Special Tools

In its complaint, Chromalloy asserts that the Navy's requirement that offerors use only GE-manufactured special tools was legally impermissible. Specifically, in Count II of its complaint, Chromalloy contends that this requirement unduly restricts competition in violation of the CICA because equivalent tools are acceptable to the Federal Aviation Administration for maintaining aircraft engines, and is unreasonable because the Navy has previously procured similar services without including such a requirement. And in Count III of its complaint, Chromalloy contends that this requirement is inconsistent with standard commercial practice in violation of the FASA. Further, in its motion for judgment on the administrative record, Chromalloy argues that because the Navy is prohibited from requiring a particular brand-name product without determining that its minimum needs could not otherwise be met, it should also be prohibited from requiring the use of particular brand-name special tools without making a minimum needs determination—and it did not make such a determination. Defendant and GE urge the rejection of Chromalloy's contentions as untimely and without merit, and defendant further urges the dismissal of Count III of the complaint on waiver grounds.

### 1.  Chromalloy's Special Tooling Arguments Are Timely

Defendant and GE first argue that all of Chromalloy's contentions regarding the special tooling requirement are untimely because Chromalloy could have, but did not, raise them before it submitted its initial proposal to the Navy. Chromalloy responds that the prohibition of non-OEM tools did not exist until the Navy amended the solicitation after receiving Chromalloy's initial proposal. Resolution of this dispute is a straightforward matter of contract interpretation.

The court interprets a solicitation in the same manner as it would a contract.  See Banknote, 365 F.3d at 1353 n.4.  Thus, as with the interpretation of a contract, the "[i]nterpretation of the solicitation is a question of law . . . ."  Id. at 1353.  The court begins by examining the solicitation's plain language, and in doing so considers "the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  Id.  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; [the court] may not resort to extrinsic evidence to interpret them."  Id.

Prior to the initial proposal submission deadline, the solicitation included the following special tooling requirement:  "The Offeror shall demonstrate it owns or has access to all necessary special tools required to completely disassemble, overhaul, and reassemble LM2500 gas generators.  The Special tooling that must be addressed [includes twenty-three items identified by 'Special Tooling Number' and 'Special Tooling Description']."  AR 280.  Defendant and GE interpret this provision to require offerors to propose the use of GE-manufactured special tools because the twenty-three tools to be addressed are identified by GE's special tooling number.  The court disagrees.

The first sentence of the special tooling requirement indicates that offerors were to demonstrate ownership of or access to the tools necessary to perform the overhaul services.  The second sentence further requires offerors to "address[]" the twenty-three listed tools.  An offeror conceivably could address one of the specified tools by indicating that it owns an equivalent tool; such a response would not run afoul of the first sentence's requirement that an offeror have the tools necessary to overhaul the engines.  Had the Navy wanted to require offerors to confirm that they owned or had access to the specified special tools, it could have been more explicit by, for example, having the second sentence read:  "The Offeror shall confirm that it owns or has access to the following twenty-three tools."  Indeed, the Navy made such a clarification when it issued Amendment 6; the new special tooling requirement provided:

> Offerors shall demonstrate [they] own[] or [have] access to all <u>OEM produced</u> special tools required to completely disassemble, overhaul, and reassemble the LM2500 engine.  The Special tooling that must be addressed [includes twenty-three items identified by 'Special Tooling Number' and 'Special Tooling Description'].  <u>Substitution of non-OEM special tooling will not be accepted[.]</u>

Id. at 288 (emphasis added).

Because the plain language of the initial special tooling provision does not include a requirement to propose the use of GE-manufactured special tools,[20] Chromalloy could not have challenged that provision on the basis that it improperly included a requirement for the use of GE-manufactured special tools.  That requirement was not added to the special tooling provision

---

[20]   To the extent that an ambiguity exists, it is a latent ambiguity upon which Chromalloy relied, and the court therefore construes that ambiguity against the drafter of the solicitation—the Navy.  See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004).

until Amendment 6.  Thus, Chromalloy's challenge, which [it] raised after the issuance of Amendment 6 but before the deadline for submitting final proposal revisions, is timely.

## 2.  CICA Claims

As noted above, Chromalloy argues that the special tooling requirement violates CICA in two respects:  it is unduly restrictive (and as such it is unnecessary to satisfy the Navy's minimum needs) and requires the use of a brand-name product when a brand-name product is unnecessary.  Before turning to the merits of these contentions, the court must address defendant's contention that Chromalloy waived the first argument, which is set forth in Count II of Chromalloy's complaint, because Chromalloy did not raise it in its motion for judgment on the administrative record.

### a.  Chromalloy Waived the Specific Arguments in Count II

As defendant correctly observes, when a plaintiff asserts a claim in its complaint but then fails to pursue it in a dispositive motion, the court can deem that claim abandoned or waived.[21] See, e.g., Webco Lumber, Inc. v. United States, 677 F.2d 860, 864 (Ct. Cl. 1982) ("Although the plaintiff's petition also alleged . . . that there was a mutual mistake in the contract . . . , the plaintiff has not argued this point in its brief.  We therefore deem the contention abandoned."); Ulman v. United States, 558 F.2d 1, 4 (Ct. Cl. 1977) (holding that a plaintiff who asserted a taking and damage claim in its complaint abandoned that claim by not raising it in his summary judgment motion); Portfolio Disposition Mgmt. Grp. LLC v. United States, 64 Fed. Cl. 1, 3 (2005) ("This argument, which is present in the Complaint but only addressed in general terms in the 'conclusion' of Plaintiff's opening brief, has essentially been abandoned by [the plaintiff]."); Fed. Mgmt. Sys., Inc. v. United States, 61 Fed. Cl. 364, 366 (2004) ("In its complaint plaintiff also challenged [the agency's] conduct of the evaluation process . . . on the same grounds that formed the basis of plaintiff's GAO protest.  Plaintiff did not raise these additional challenges in its brief or at argument.  Accordingly these claims are deemed abandoned.").  Defendant argues that Chromalloy, in its motion for judgment on the administrative record, did not argue that the special tooling requirement was unduly restrictive or apply the relevant legal standard for evaluating claims that a solicitation provision is unduly restrictive.  It therefore contends that Chromalloy waived the argument.  Chromalloy did not respond to defendant's contention.

A comparison of Count II of Chromalloy's complaint and Chromalloy's motion for judgment on the administrative record reflects that Chromalloy changed the basis for its contention that the Navy unduly restricted competition with the special tooling requirement.  In Count II, Chromalloy contends that the special tooling requirement unduly restricts competition (and does not reflect the Navy's minimum needs) because another agency, the Federal Aviation

---

[21]   Defendant relies in part on SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006), for the proposition that "arguments not raised in the opening brief are waived."  In SmithKline Beecham, the court held that the appellant failed to preserve an issue for appeal by not raising the issue in its opening brief.  Id.  Thus, even though the underlying principle is the same (a litigant abandons an issue when it does not pursue it), the procedural posture of SmithKline Beecham is distinguishable from the circumstances presented here.

Administration, allowed the use of equivalent tools and because the Navy had not included the special tooling requirement in prior, similar procurements.  In contrast, in its motion, Chromalloy contends (albeit with less precision than in its complaint) that the special tooling requirement unduly restricts competition (and does not reflect the Navy's minimum needs) because the FAR prohibits the Navy from requiring the use of a brand-name product when a brand-name product is unnecessary to perform the services being procured.  Because Chromalloy does not pursue the arguments set forth in Count II,[22] the court deems them abandoned and will not address them.  Nevertheless, it will address the merits of Chromalloy's contention, set forth in its motion, that the Navy improperly required the use of brand-name products to perform the overhaul services it was acquiring.[23]

### b. FAR 11.105 Does Not Apply to the Special Tooling Requirement

Chromalloy's contention that the Navy unduly restricted competition and imposed a requirement beyond its minimum needs by requiring the use of GE-manufactured special tools is premised on the provisions of the FAR that describe how agencies should describe their minimum needs.  In particular, FAR 11.105 provides:

> Agency requirements shall not be written so as to require a particular brand name, product, or a feature of a product, peculiar to one manufacturer, thereby precluding consideration of a product manufactured by another company, unless—
>
> (a)(1) The particular brand name, product, or feature is essential to the Government's requirements, and market research indicates other companies' similar products, or products lacking the particular feature, do not meet, or cannot be modified to meet, the agency's needs; [and]
>
>> (2)(i) The authority to contract without providing for full and open competition is supported by the required justifications and approvals . . . .

Chromalloy acknowledges that this provision applies to the acquisition of end products, and not to the products that an offeror might use to perform the services being procured.  Nevertheless, it argues that if a procuring agency must justify that the acquisition of a brand-name product is necessary to satisfy its minimum needs, then it follows that the procuring agency must justify a

---

[22]  Chromalloy briefly mentions the Federal Aviation Administration's recognition of equivalent tools in its reply and response to rebut GE's contention that equivalent tooling cannot exist.  That reference is too little, too late.  See SmithKline Beecham, 439 F.3d at 1319 ("[A]rguments not raised in the opening brief are waived."), 1320 (citing multiple federal circuit court decisions for the proposition that a perfunctory reference is insufficient to preserve an argument).

[23]  The court can address Chromalloy's brand-name product argument pursuant to RCFC 15(b)(2) because Chromalloy and defendant fully briefed it and therefore it was tried by consent.  See supra note 19.

requirement that contractors use brand-name products to perform the contracted-for services as necessary to satisfy its minimum needs.

Chromalloy's concession that the FAR's provisions regarding brand-name products concern the acquisition of end products and not the products used to perform services is fatal to its argument. Chromalloy has identified no provision of the FAR that prohibits procuring agencies from requiring offerors to demonstrate ownership of or access to a brand-name product as a factor in determining technical capability to perform a service. Moreover, as noted above, procuring agencies have great discretion in determining their minimum needs, Savantage, 595 F.3d at 1286, and the evidence in the administrative record reflects "a coherent and reasonable explanation" for the Navy's determination that GE-manufactured special tools are necessary to overhaul the LM2500 engines, Centech Grp., 554 F.3d at 1037 (quoting Impresa, 238 F.3d at 1333). Specifically, Mr. Driscoll indicated that the Navy itself only purchases the necessary special tools from a company who had access to GE proprietary information, thus ensuring that the special tools meet the necessary standards. Accordingly, the court rejects Chromalloy's contention that the special tooling requirement unduly restricts competition and imposes a requirement beyond what is necessary for the overhaul of the LM2500 PBT Gas Generators.

### 3. FASA Claim

Chromalloy's final contention regarding the special tooling requirement is that the requirement is inconsistent with standard commercial practice in violation of the FASA, specifically contending that the Navy did not conduct any market research to determine whether it was standard commercial practice to prohibit the use of equivalent special tools and that no market research could have revealed that the special tooling requirement was standard commercial practice. Pursuant to the FASA, procuring agencies are required "to purchase commercial items under commercial terms to the maximum extent practicable." CGI Fed., 779 F.3d at 1352; accord 10 U.S.C. § 2377(a)-(b) (describing the preference for commercial items). Agencies must conduct market research "to determine whether there are commercial items" that meet their requirements. 10 U.S.C. § 2377(c)(2); accord FAR 12.101(a); FAR 12.202(a). When market research reveals the availability of suitable commercial items, contracts for their acquisition "shall, to the maximum extent practicable, include only those clauses" required by law or "[d]etermined to be consistent with customary commercial practice." FAR 12.301(a); see also FAR 12.301(b)-(d) (setting forth the provisions and clauses that must be included "in solicitations and contracts for the acquisition of commercial items"). "The contracting officer shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures." FAR 12.302(c).

### a. Chromalloy Has Not Waived Its FASA Argument

The court first addresses defendant's contention that, under the Blue & Gold Fleet waiver rule, Chromalloy waived its FASA argument by failing to raise it prior to the deadline for submitting final proposal revisions, as reflected by the fact that Chromalloy did not include the contention in its second GAO protest. Chromalloy responds, as it did with respect to its proper

justification argument, that it raised its FASA argument in its GAO protest and diligently pursued that protest, and that the purpose of the <u>Blue & Gold Fleet</u> waiver rule would not be thwarted by the court considering the argument because the two other offerors' ability to receive a contract would not be affected.

Once again, defendant's characterization of Chromalloy's GAO protest is correct. Although Chromalloy identified the solicitation as a commercial item/commercial services procurement and indicated that it provided LM2500 engine overhaul services in the commercial marketplace, it did not contend that the Navy violated the FASA or any provision of FAR part 12.  However, once again, Chromalloy is also correct that the purpose of the waiver rule is not implicated in this protest.  It did not wait to challenge the special tooling requirement until after proposals were submitted and then upon learning that it was an unsuccessful offeror, ambush the Navy and the other offerors by objecting to a patent error in the solicitation.  Indeed, the GAO protest alerted the Navy that Chromalloy objected to the special tooling requirement.  Moreover, neither the Navy nor the other offerors would be prejudiced by Chromalloy pursuing its FASA argument in this court:  the parties fully briefed the argument and the court's consideration of the argument would not affect the other two offerors' ability to receive an award (since they were awarded contracts by virtue of possessing GE Level IV licenses and did not need to demonstrate ownership of or access to special tools).  Accordingly, Chromalloy has not waived its proper justification argument.

### b. Chromalloy's FASA Argument Lacks Merit

Chromalloy argues that the Navy violated the FASA because it did not conduct market research to determine whether prohibiting the use of equivalent tools was consistent with customary commercial practice as required by FAR 12.101(a) and FAR 12.202(a), and that in any event, the special tooling requirement was not customary commercial practice.  Defendant counters that FAR part 12 restricts a procuring agency's ability to alter the standard commercial item provisions and clauses, and not a procuring agency's ability to establish technical capability requirements such as the special tooling requirement.  Defendant further argues that the Navy did conduct market research, asserting that Mr. Driscoll's identification of the twenty-three most important special tools based on his extensive experience satisfied the market research requirement.  Finally, defendant and GE contend that Chromalloy has failed to satisfy its burden of establishing that the use of equivalent special tools is customary commercial practice.  This latter argument is dispositive.

The administrative record includes no evidence that the use of equivalent special tools is standard commercial practice for the overhaul of LM2500 engines.  Rather, the evidence merely reflects that Chromalloy overhauled unspecified engines for several private companies.  The court cannot infer from this evidence that the engines were LM2500 engines or that Chromalloy used equivalent tools to overhaul those engines.  Because Chromalloy cannot demonstrate that the Navy departed from customary commercial practice without establishing what constitutes customary commercial practice,[24] its FASA argument must be rejected.

---

[24]  GE also responds to Chromalloy's FASA argument by contending that requiring the use of GE-manufactured tools was consistent with customary commercial practice because it was

### 4.  Summary

In sum, Chromalloy has not met its burden of proving that the Navy violated the CICA or the FASA by prohibiting the use of special tools not manufactured by GE.  This failure is independently fatal to Chromalloy's protest because Chromalloy concedes that it does not own or have access to certain, required GE-manufactured tools.

### F.  Access to Spare Parts

Finally, in its supplemental complaint, Chromalloy contends that the Navy's interpretation of the solicitation's spare parts access requirement was unreasonable and, therefore, that the Navy's evaluation of the information provided by Chromalloy to satisfy the requirement was unreasonable.  The court declines to address this claim for three independent reasons.  First, Chromalloy has not succeeded on its challenges to the solicitation requirements that it cannot satisfy, rendering moot any challenge to the Navy's evaluation of its proposal under a separate solicitation requirement.  Second, Chromalloy and defendant both contend that Chromalloy's spare parts access claim is moot regardless of which party prevails on Chromalloy's preaward challenge to the terms of the solicitation.  Third, Chromalloy has abandoned its spare parts access claim by failing to raise it in its motion for judgment on the administrative record.[25]

### G.  Injunctive Relief

Chromalloy has failed to establish that the challenged solicitation requirements violate statute or regulation.[26]  In other words, it has not succeeded on the merits of its claims.  Therefore, the court need not address the remaining elements of Chromalloy's request for injunctive relief:  irreparable injury, balance of harms, and the public interest.

Nevertheless, two observations are warranted.  First, Chromalloy failed to present any evidence that it was irreparably injured by the Navy's actions, either via affidavit or otherwise.  Protestors may not rely on attorney argument to establish irreparable injury.  See, e.g., Intelligent Waves, LLC v. United States, 135 Fed. Cl. 299, 314 (2017) (noting that the protestors, rather than submitting evidence in support of their claims of irreparable injury, relied on the averments of counsel, and holding that neither protestor "provided the court with the evidence necessary to carry its burden"); Totolo/King, 87 Fed. Cl. at 693 ("Nor can a court evaluate the parties' factual

---

consistent with GE's practice for overhauling LM2500 engines.  Because Chromalloy has not satisfied its burden to establish that the use of equivalent tools is customary commercial practice, the court need not assess the merits of GE's assertion.

[25]  Chromalloy's assertions that the court need not resolve this claim do not relieve it of its responsibility to pursue all of the claims set forth in its complaint.

[26]  Consequently, the court need not determine whether Chromalloy was prejudiced by the Navy's imposition of those requirements.

showings regarding the three equitable findings for injunctive relief without accepting post-final-agency-action evidentiary submissions."); Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009) (holding that evidence "pertaining to . . . the factors governing injunctive relief . . . is crucial to assess whether relief is warranted").

Second, defendant presents a compelling argument that injunctive relief is not appropriate due to national security concerns. When deciding whether to award injunctive relief, the court must balance the relevant factors; a "weakness of the showing regarding one factor may be overborne by the strength of the others" and "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief. FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).[27] Moreover, when crafting such relief, the court is required to "give due regard to the interests of national defense and national security . . . ." 28 U.S.C. § 1491(b)(3); accord PGBA, LLC v. United States, 389 F.3d 1219, 1226 (Fed. Cir. 2004). Accordingly,

> when military and national security interests are implicated, the public interest factor gains "inflated" importance in the court's balancing of the equities. Indeed, in such instances, the court must consider the military's interests when weighing both the public interest and the balance of hardships. And when these interests raise national security concerns, they place the weight of both the public interest and the balance of hardships firmly on defendant's side of the scale.

Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 702 (2010) (citations omitted).

In support of its contention that national security interests require the denial of injunctive relief, defendant submitted a sworn declaration from Mr. Hann, who is "a Branch Head and Contracting Officer" with the Navy "responsible for reviewing acquisition packages, planning and coordinating strategy meetings, leading acquisition strategy meetings, [and] assigning and managing workload within [his] branch . . . ." Hann Decl. ¶ 1. Mr. Hann is the contracting officer for the procurement at issue, and was also the contracting officer for two prior LM2500 engine overhaul contracts. Id. ¶ 2. He explains that the LM2500 engines are used on ships "designated Core National Security assets in defense of our nation," that each ship uses two or four engines, and that the Navy's "entire fleet has installed [. . .] LM2500 engines." Id. ¶ 4. He further explains that "the Navy requires spare LM2500 gas generators and power turbines in the event of engine failures aboard ship," and that "these spares are part of the war reserve requirement" of [. . .] spare LM2500 PBT Gas Generators and [. . .] LM2500 SST Gas Generators. Id. ¶ 7. According to Mr. Hann, although the Navy currently has [. . .] spare LM2500 PBT Gas Generators, "there is a demand for" [. . .] these engines "[. . .] as part of the CG 47 Class Cruiser Modernization program." Id. ¶ 8.

---

[27] Although FMC Corp. concerns the award of a preliminary injunction, 3 F.3d at 427, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

Mr. Hann avers that given these circumstances, if the Navy was prevented from issuing task orders under the two contracts awarded from the solicitation at issue, it would be unable to return the ships being modernized—which "are used in critical missions such as Anti-Air Warfare, Undersea Warfare, Naval Surface Fire Support, and Surface Warfare"—to its fleet and would not have the [. . .] spare engines necessary for its war reserve.  Id. ¶¶ 6, 8.  [. . .]  Mr. Hann therefore concludes:  "[A] permanent injunction precluding the Navy from issuing further task orders for the overhaul of PBT LM2500 engines creates risk to national security because the Navy will experience a decrease in the availability of LM2500 generators that are required to support surface combatant ships performing critical missions such as Carrier Strike Group and Ballistic Missile Defense operations around the globe."  Id. ¶ 10; accord id. ¶ 5 ("A permanent injunction precluding the Navy from issuing further task orders under the protested contract awards will preclude multiple Navy programs and ships from being able to support their mission requirements.  Failure to award additional task orders under this contract will have widespread collateral impact across the surface fleet, as Navy surface combatants would be negatively impacted.").

Chromalloy's only substantive response to the Navy's position is that the Navy's concern regarding having sufficient spare engines reinforces its contention that a permanent injunction is appropriate because awarding a contract to Chromalloy would increase the Navy's capacity to overhaul the engines.[28]  However, as defendant observes, a broad injunction would result in the cessation of all overhaul efforts for the time it would take for the Navy to amend the solicitation and evaluate new proposals, negatively impacting the Navy's ability to overhaul the engines.  Moreover, even under a narrowly crafted injunction by which the court would not disturb the contract awards to the other offerors,[29] fairness would dictate that no further task orders be issued under those contracts so that Chromalloy—if awarded a contract after further review—would have the full opportunity to compete for the task orders.  Consequently, even a narrow injunction would inhibit the Navy's ability to overhaul the engines.

In sum, the unrebutted evidence submitted by defendant supports the conclusion that injunctive relief would adversely affect national security.  Therefore, even if Chromalloy had succeeded on the merits of its protest, the court would deny an award of injunctive relief.

---

[28]  Chromalloy also argues that Mr. Hann's declaration is inadmissible because Mr. Hann lacks personal knowledge of the facts he recites.  This contention is wholly without merit.  The declaration establishes that Mr. Hann is the contracting officer for procuring LM2500 engine overhaul services and is familiar with both the Navy's needs for those services and the consequences for not procuring those services.  It is implausible that a contracting officer charged with procuring a service would not know the reason for procuring the service or the consequences of not procuring the service.  Moreover, Mr. Hann offered his declaration under penalty of perjury, lending further credence to his factual averments.

[29]  Such an injunction was discussed by the parties during oral argument.

## III.  CONCLUSION

The evidence in the administrative record does not portray a model source selection process.  The Navy seemingly took corrective action and amended the solicitation without fully understanding the consequences of its amendment, and then reversed course again when faced with heavy pressure from GE.  Nevertheless, the Navy's decisions to require independent access to GE's technical manuals and service bulletins and use of GE-manufactured special tools find support in the administrative record.  Therefore, for the reasons explained above, the court **DENIES** Chromalloy's motion to strike the second administrative record or, alternatively, to supplement the administrative record; **DENIES** Chromalloy's motion for judgment on the administrative record; and **GRANTS** defendant's and GE's cross-motions for judgment on the administrative record.  No costs.  The clerk shall close this bid protest and enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, November 15, 2019**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on July 10, 2019, to file redacted versions of protected documents for the public record.  If the parties have not already filed redacted versions of their motions and supporting briefs, they shall file a joint status report by **no later than Friday, November 15, 2019**, explaining the reason for the delay.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge